THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DABNEY TATUM, Defendant-Appellant.

First District (2nd Division)   No. 1—07—1372

Opinion filed March 31, 2009.

Patricia Unsinn and Jessica Wynne Arizo, both of State Appellate Defender's Office, of Chicago, for appellant.

Anita Alvarez, State's Attorney, of Chicago (James E. Fitzgerald, Alan J. Spellberg, Tasha-Marie Kelly, and Omar Jaleel, Assistant State's Attorneys, of counsel), for the People.

JUSTICE KARNEZIS delivered the opinion of the court:

Following a jury trial, defendant Dabney Tatum was found guilty of residential burglary and was sentenced as a Class X offender to a term of 28 years' imprisonment. On appeal, defendant raises the following contentions of error. Defendant contends that: (1) he was not proven guilty beyond a reasonable doubt; (2) he was denied a fair trial because of the trial court's actions and comments toward him; (3) he was not mentally competent to represent himself *pro se* at trial; (4) he was prejudiced by the State's rebuttal closing argument; (5) the jury instructions were improper; and (6) his sentence was an abuse of discretion. For the following reasons, we affirm.

## BACKGROUND

Defendant's conviction arose from the residential burglary of a home at 4833 North Rutherford Avenue in Chicago on August 10, 2004. Bernadetta Wolna, who primarily speaks Polish, testified through an interpreter that she, her husband and their two teenage children resided at the home. Bernadetta stated that on that date, she and her son returned home at about 2:20 p.m. She walked toward the back of the home and saw defendant run out of her daughter's bedroom. Bernadetta ran after defendant, who was headed toward the back door. She grabbed his arm and asked him in Polish what he had stolen. Defendant did not respond, but tried to open the back door. She was only a foot from defendant and was able to see his face. After a minute or two, Bernadetta let go of defendant's arm because she became scared. She described defendant as acting nervous and appearing like he was in shock. When she let go of defendant, he ran out the

back door. Bernadetta went into her daughter's bedroom and noticed that the room had been "ransacked." There was a black bag lying on the floor next to the closet, which contained a camera, watch and jewelry. A jewelry box that had been hidden under clothes in the closet had been moved. There was also a pack of cigarettes on the floor. Bernadetta told police officers that defendant did not have a beard or mustache and did not have any distinguishing marks on his face. She described defendant as having long, dark blonde hair and wearing a gray jacket, black pants, and rubber gloves. She also made an in-court identification of defendant and stated that she would never forget defendant's face.

Bernadetta further testified that on September 8, 2004, she identified defendant in a photo array. On September 13, 2004, Bernadetta identified defendant in a lineup. She testified that defendant's hair had been cut short since the time she had seen him in her home. On cross-examination, Bernadetta admitted that she did not see the offender's eyes because they were "halfway shut" and could not remember his eye color.

Adam Wolny[1], Bernadetta's son, who was 15 years old at the time of the offense, described defendant's hair as shoulder length and stated that defendant was wearing a light gray jacket, black pants and rubber gloves. Adam further testified that on September 8, 2004, he identified defendant in a photo array. On September 13, 2004, however, he was unable to identify defendant in a lineup. Adam stated that he was unable to identify defendant, "because the only thing I really remember about the defendant was his long hair."

Elzbieta[2] Wolna testified that on the date of the offense, she was out of town. She stated that before she left, her room was tidy and there was a black bag by the wall that was empty. She kept a camera and a jewelry box in the closet. The jewelry box was hidden under clothing and contained rings, earrings and necklaces. When she returned home, there were about 10 rings missing from the jewelry box. Elzbieta further stated that she did not smoke cigarettes and there was not a pack of cigarettes on the floor of her room when she left.

Detective Raymond Ernst testified that the pictures of individuals in the photo array that he showed Bernadetta and Adam all had similar characteristics. They were white males, about the same age as

[1]Testimony at trial established that Adam's last name ended in "y" rather than "a" because, in the Polish language, a woman's last name generally ends in "a" and a man's last name generally ends in "y" or "i".

[2]Elzbieta is also referred to as Elizabeth in the record.

defendant and had long hair. Detective Ernst stated that he showed Bernadetta and Adam the photo array separately and told them that they may or may not recognize anyone in the photos.

Detective Ernst further testified that officers arrested defendant on September 13, 2004. Officers recovered a pack of Winston 100 Lights cigarettes from his person, which was the same type as was recovered from Elzbieta's room. After reading defendant his *Miranda* rights, Detective Ernst asked defendant when defendant cut his hair. Defendant told the detective that he had his hair cut about a month earlier at the Supercuts at Harlem Avenue and Touhy Avenue. Detective Ernst went to the Supercuts at that location and asked to see receipts from August 10, 11 and 12. He found a receipt from August 11 with the name "Tatum." Detective Ernst further stated that no fingerprints were recovered from the home or from the cigarettes recovered from the home.

On cross-examination, Detective Ernst admitted that the name on the Supercuts receipt was spelled "Tadam" and that nobody at Supercuts remembered defendant. The detective further stated that when defendant was arrested, officers did not recover any rings, gloves or burglary tools from defendant.

Defendant testified in narrative form that on September 13, 2004, he went to court for a misdemeanor charge that was dismissed. As he was walking out of the courtroom, Detective Ernst approached him and said he would like to talk to defendant. He told defendant that defendant may be a suspect in a burglary and asked defendant to come to the police station. Defendant agreed. When defendant arrived at the police station, the detective placed him under arrest. Defendant told the detective that he was not involved in the burglary. He testified that "on that date, I was not in Mrs. Wolna's home. It was not me. I'm not the person. I live two doors away from her. I painted the garages that are right next to her home." Defendant also denied getting his haircut at Supercuts on August 11. On cross-examination, defendant denied having a pack of cigarettes on his person when he was arrested.

## ANALYSIS

### 1. Reasonable Doubt

On appeal, defendant first contends that he was not proven guilty beyond a reasonable doubt because Bernadetta's and Adam's identifications of him as the offender were insufficient. He maintains that Bernadetta and Adam identified him as the offender not because they remembered him in their home but because they recognized him from the neighborhood.

When considering the sufficiency of the evidence on appeal, we view the evidence in the light most favorable to the prosecution and determine whether any rational trier of fact could have found the elements of the crime proven beyond a reasonable doubt. *People v. Young*, 128 Ill. 2d 1, 49 (1989). We will not reverse a conviction on grounds of insufficient evidence unless that evidence is so unsatisfactory as to raise a reasonable doubt of defendant's guilt. *People v. Furby*, 138 Ill. 2d 434, 455 (1990).

To sustain a charge of residential burglary, the State was required to prove that defendant "knowingly and without authority enter[ed] or knowingly and without authority remain[ed] within the dwelling place of another, or any part thereof, with the intent to commit therein a felony or theft." 720 ILCS 5/19—3(a) (West 2004).

The State has the burden of proving beyond a reasonable doubt the identity of the person who committed the crime. See 720 ILCS 5/3—1 (West 2004). The identification of a single witness is sufficient to sustain a conviction if the witness viewed the accused under circumstances that allowed a positive identification. *People v. Mullen*, 313 Ill. App. 3d 718, 724 (2000). A witness's testimony requires no corroboration and need not be unequivocal. *People v. Doll*, 371 Ill. App. 3d 1131, 1138 (2007). However, an identification will not be deemed sufficient to support a conviction if it is vague or doubtful. *People v. Rodriguez*, 312 Ill. App. 3d 920, 933 (2000).

In evaluating the reliability of an identification, we consider: (1) the opportunity the victim had to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the victim at the identification confrontation; and (5) the length of time between the crime and the identification. *People v. Slim*, 127 Ill. 2d 302, 307-08 (1989), citing *Neil v. Biggers*, 409 U.S. 188, 199-200, 34 L. Ed. 2d 401, 411, 93 S. Ct. 375, 382 (1972).

■ Here, we find that Bernadetta's testimony was sufficient to support defendant's conviction. Bernadetta testified that she stood about a foot from defendant and was able to see defendant's face when she was holding his arm. She told police officers that defendant did not have a beard or mustache and did not have any distinguishing marks on his face. She admitted that she did not see defendant's eyes because they were "halfway shut." Bernadetta was also able to describe defendant's appearance and clothing to officers. Further, Bernadetta positively identified defendant in a photo array and in a lineup just one month after the offense. She further stated at trial that she would never forget defendant's face. We find that Bernadetta's identification was made under circumstances that allowed a positive

identification and was not vague or doubtful. As such, her identification was sufficient to support defendant's conviction.

With respect to Adam's identification of defendant, we acknowledge that it was not as strong as Bernadetta's identification. However, we note that Adam's description of defendant's clothing to police officers matched Bernadetta's description. Even without Adam's identification, Bernadetta's identification was sufficient to support defendant's conviction. See *People v. Mullen*, 313 Ill. App. 3d at 724 (the identification of a single witness is sufficient to sustain a conviction if the witness viewed the accused under circumstances that allowed a positive identification).

Defendant further contends that the circumstantial evidence against him was insufficient to support his conviction. He argues that the receipt from Supercuts with the name "Tadam" did not refer to him and none of the workers remembered cutting his hair. Defendant also argues that the pack of cigarettes recovered from the scene did not link him to the crime.

Despite defendant's additional contentions concerning reasonable doubt, we find that the State, through Bernadetta's testimony, proved beyond a reasonable doubt that defendant committed the offense of residential burglary.

## 2. The Trial Court's Comments and Actions

Next, defendant contends that the trial court's comments and actions throughout trial improperly prejudiced him in front of the jury and denied him the right to a fair trial.

Defendants are entitled to a trial that is free from improper and prejudicial comments by the trial judge. *People Heidorn*, 114 Ill. App. 3d 933, 936 (1983). The trial judge has wide discretion in presiding over a trial, but cannot make comments or insinuations indicating its opinion on the credibility of a witness or the argument of counsel. *People v. Enoch*, 189 Ill. App. 3d 535, 543 (1989). The trial judge must exercise a high degree of care to avoid influencing the jurors in any way, to remain impartial and to not display prejudice or favor toward any party, due to the judge's great influence over the jury. *Heidorn*, 114 Ill. App. 3d at 937. However, even when the trial judge does make improper comments, those comments will only constitute reversible error if the remarks were prejudicial and the defendant was harmed by the comments. *Heidorn*, 114 Ill. App. 3d at 937.

## A. The Trial Court's Comments

Defendant argues that the trial court's comments during his closing argument that he was "making up" information and was "committing a falsehood" were improper and prejudicial.

During defendant's closing argument, defendant attempted to refer to a police report. The State objected and the court informed defendant that a police report was not evidence and defendant could not refer to it. When defendant continued to refer to the police report, the court stated, "jury is to disregard anything that the defendant is making up at this time concerning police reports because police reports are not evidence."

Later in defendant's closing argument, defendant attempted to argue to the jury that he was denied access to the law library during trial. The trial court informed the jury that defendant's statement was a "falsehood" because the court had given him many orders allowing him access to the law library.

Defendant relies on *People v. Mitchell*, 228 Ill. App. 3d 167, 169 (1992), a case in which this court held that the trial judge's comments were biased and prejudicial, resulting in a new trial for the defendant. In *Mitchell*, this court found that the trial judge continuously made disparaging remarks regarding the defense's evidence and theories and belittled and mocked defense counsel. For example, the trial judge stated, " '[h]e just said he doesn't remember his exact words, and it's quite obvious there was no conversation like the one you just made up.' " *Mitchell*, 228 Ill. App. 3d at 170. Defendant argues that the judge's comment in *Mitchell* was similar to the judge's comments that defendant was "making up" information and was committing a "falsehood," and this court should similarly find that defendant was prejudiced by the comments.

■ Here, defendant, acting as his own attorney, was required to follow evidentiary rules, which he failed to do. The trial court repeatedly informed defendant that he could not refer to the police report in closing argument because the police report was not evidence. However, defendant continued talking to the jury and arguing that police officers changed the description of the offender in their police report to match defendant. Because defendant refused to listen to the trial court, the court needed to cure any misinformation that defendant had communicated to the jury. The fact that the court told the jurors they should disregard what defendant was "making up" concerning police reports, rather than benignly stating that defendant's statements regarding police reports should simply be disregarded, was not prejudicial or harmful and did not constitute error. Additionally, the trial court's "falsehood" comment was necessary to correct misinformation that defendant attempted to argue to the jury and did not constitute error.

We find *Mitchell* distinguishable. This court noted in *Mitchell* numerous instances of judicial bias and further stated that if any one

of the judge's remarks was insufficient to establish bias and prejudice, then all of the remarks taken together, coupled with the judge's hostile attitude, denied the defendant a fair trial. *Mitchell*, 228 Ill. App. 3d at 171. Here, in contrast, the comments defendant references do not amount to the judicial bias found pervasive in *Mitchell* and do not amount to error.

## B. The Trial Court's Actions

Defendant argues that the trial court's actions of holding him in contempt of court in front of the jury were improper and prejudicial, and removing him from the courtroom violated his constitutional right to be present at his trial.

During the State's rebuttal argument, the following colloquy occurred:

"MS. WALDECK [Assistant State's Attorney]: *** [T]hat Detective Ernst took that witness stand, raised his right hand, and swore to God to tell the truth, the God he wants to tell you how much he believes in and committed, in essence—

DEFENDANT: I certainly do believe in God.

MS. WALDECK: —of perjury? For what? All for the purposes of framing this guy? Some person he's never met before?

DEFENDANT: Officer's done worse.

MS. WALDECK: When you go back there, ask yourselves this question, why? Why the lies? Detective Ernst doesn't know him. He's got no ax to grind against him. He doesn't know him from Adam.

DEFENDANT: Your Honor, I object to that. Your Honor, the prosecution doesn't know what axes anyone's got to grind. The prosecution here has no idea about grinding axes.

THE COURT: You may continue.

DEFENDANT: The prosecution might need to grind an ax. You know, it's ludicrous. This kind of stuff is crazy.

MS. BROWN [Assistant State's Attorney]: Can I ask that the defendant be admonished to the outburst?

DEFENDANT: It's not an outburst.

THE COURT: Any more outbursts and personal comments to the prosecutor, and you will be held in contempt of Court.

MS. WALDECK: *** [A]nd for some reason, we all joined forces in some massive conspiracy to frame this guy, someone who we never met. I don't know where we went to hatch this plan. Maybe we rented out the United Center, and we all met there, and we came up with our plan.

DEFENDANT: The Cook County Jail is the United Center. It is the United Center pool of guys that—

MS. BROWN: Objection, Judge.

THE COURT: Mr. Tatum will be held in contempt of Court.

DEFENDANT: So, don't even try that.

THE COURT: Mr. Tatum will be held in contempt of Court.

DEFENDANT: Like you don't do something that's unethical? Lady, you probably don't have no ethics at all.

MS. BROWN: I ask that the defendant be removed from the courtroom.

DEFENDANT: You can ask whatever you want to ask, whatever you want to ask. The truth has been told, simple as that.

THE COURT: The defendant is held in contempt of Court. I will reserve sentencing after closing argument.

\* \* \*

MS. WALDECK: Thank you. Ladies and gentlemen, let me suggest this. The defendant in this case has chosen to represent himself in an effort to manipulate—

DEFENDANT: No. I chose it because the Public Defender's Office—I don't have $20,000 for an attorney. I can't pay for an attorney. I don't have the money for an attorney.

THE COURT: Mr. Tatum—

DEFENDANT: I don't have—

THE COURT: We're all in the same room and the jury does not need you—

DEFENDANT: Let's get real about this here.

THE COURT: —to yell at them.

DEFENDANT: I cannot afford an attorney. I cannot afford $10,000, $20,000—

THE COURT: Sit down.

DEFENDANT: —for a high class attorney to walk in here and defend my case.

THE COURT: Sit down.

DEFENDANT: I can't do that.

THE COURT: Sit down.

DEFENDANT: No.

THE COURT: Take him into custody. We'll be taking a five minute break.

(Short recess.)

THE COURT: Ladies and gentlemen of the jury, you may be seated. Based on the defendant's outburst and refusal to obey the orders of this Court, his continual outbursts and shouting and yelling at both the prosecutors and myself during the prosecutor's closing argument, the defendant has been removed from the courtroom. The defendant is now in the back, and he has a speaker phone that is on. I put my speaker phone on in the courtroom so he will be able to listen to the last minute or minute and a half of the State's rebuttal."

Criminal contempt of court is conduct that is designed to embarrass, hinder, or obstruct a court in its administration of justice or derogate from its authority or dignity. *People v. Simac*, 161 Ill. 2d 297, 305 (1994). All courts have the inherent power to punish contempt. *Simac*, 161 Ill. 2d at 305. When reviewing a finding of direct criminal contempt, this court considers whether there was sufficient evidence to support the finding. *Simac*, 161 Ill. 2d at 306.

Defendant argues that he should not have been held in contempt of court because his comments were not intended to obstruct the trial; rather, they were intended as objections to the State's argument. Specifically, defendant alleges that although his outbursts did not take the form of "traditional objections," the court should have counseled him that if he wanted to object, he should say "I object," rather than holding him in contempt of court. Defendant also argues that if the court's order finding him in contempt was proper, then the court should have done so outside the presence of the jury to avoid prejudicing defendant. Defendant further cites to this court's unpublished order pursuant to Supreme Court Rule 23 (166 Ill. 2d R. 23), which reversed the trial court's previous order finding defendant in contempt of court to show the judge's lack of patience with defendant throughout trial.[3]

■ Here, we find that there was sufficient evidence to support the trial court's order finding defendant in contempt of court. Defendant repeatedly interrupted the prosecutor during her rebuttal closing argument. The judge warned defendant that if his outbursts and personal comments continued he would be held in contempt. Defendant then continued to interrupt the prosecutor and comment on her argument. Defendant's comments were not intended as objections, but were intended to hinder and obstruct the court in its administration of justice. We are not so naive to believe, as defendant claims, that at this point in the trial defendant was unaware as to how to make a proper objection. Merely stating "objection" was perhaps defendant's easiest hurdle to ascend during his *pro se* representation. Also, defendant cites no authority, and we find none, to support his contention that the trial court should have held him in contempt outside the presence of the jury. Moreover, it is improper for defendant to cite to an unpublished Rule 23 order to support his contention that the trial judge lacked patience. Rule 23(e) states "[a]n unpublished order of the court is not precedential and may not be cited by any party except to support contentions of double jeopardy, *res judicata*, collateral estoppel or law of the case." 166 Ill. 2d R. 23(e).

---

[3]*People v. Tatum*, No. 1—05—0962 (2006) (unpublished order under Supreme Court Rule 23).

Defendant also argues that he was prejudiced by the trial court removing him from the courtroom, which violated his constitutional right to be present at trial.

An accused's right to be present in the courtroom during every stage of his trial is one of the most basic rights guaranteed by the confrontation clause of the sixth amendment to the United States Constitution. *Illinois v. Allen*, 397 U.S. 337, 338, 25 L. Ed. 2d 353, 356, 90 S. Ct. 1057, 1058 (1970). However, a defendant can lose this right if, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, he continues to behave in a manner that is disorderly, disruptive, and disrespectful to the court, such that his trial cannot be carried on with him in the courtroom. *Allen*, 397 U.S. at 343, 25 L. Ed. 2d at 358-59, 90 S. Ct. at 1060-01. The Supreme Court in *Allen* reasoned that, "[i]t would degrade our country and our judicial system to permit our courts to be bullied, insulted, and humiliated and their orderly progress thwarted and obstructed by defendants brought before them charged with crimes." *Allen*, 397 U.S. at 346, 25 L. Ed. 2d at 360-61, 90 S. Ct. at 1062. The Supreme Court further noted that when a trial judge is confronted with an "obstreperous" defendant, it would be constitutional for the defendant to be bound and gagged, thereby keeping him present for his trial. *Allen*, 397 U.S. at 343-44, 25 L. Ed. 2d at 359, 90 S. Ct. at 1061. However, the Court cautioned against such a drastic measure because it would have a "significant effect on the jury's feelings about the defendant." *Allen*, 397 U.S. at 344, 25 L. Ed. 2d at 359, 90 S. Ct. at 1061.

Here, defendant's continual interruptions and comments were disorderly, disruptive and disrespectful to the court. Defendant's behavior was the type of "obstreperous" behavior that the Court in *Allen* found unacceptable. Defendant continued to interrupt the proceedings and refused to sit down after the court asked him three times. The trial court's action of removing defendant from the courtroom was far less prejudicial than having defendant remain in the courtroom bound and gagged, which, pursuant to *Allen*, would have been constitutional, albeit not desirable. As Justice Brennan stated in his concurrence, "[t]o allow the disruptive activities of a defendant *** to prevent his trial is to allow him to profit from his own wrong." *Allen*, 397 U.S. at 350, 25 L. Ed. 2d at 362, 90 S. Ct. at 1064 (Brennan, J., concurring). To hold, as defendant argues, that he was prejudiced by his removal from the courtroom would be to allow defendant to profit from his own wrong behavior. Moreover, we note that defendant was removed from the courtroom during the State's rebuttal argument, at which point the trial was almost over. We do not

find any error in the trial court's action of removing defendant from the courtroom.

■ Defendant also argues that the trial court's action of taking away a paper clip he was holding during his testimony was prejudicial and showed that the judge was biased against defendant. Defendant argues that the judge's action suggested to the jury that defendant was dangerous and could not be trusted with a simple object such as a paper clip. Defendant also argues that because the court did not make any comment on why she was taking the paper clip from defendant, the jury was free to speculate that defendant had exhibited violent tendencies in the courtroom at some previous time.

During defendant's cross-examination, the following colloquy occurred:

"THE COURT: Excuse me one second. Can you give me these items that you have in your hands, please? Can I have those, please? Thank you.

* * *

DEFENDANT: Objection, your Honor. I object to the fact that you asked me for an item, when I'm on the witness stand, out of my hand. What is that? I mean, what are you doing here? What am I, a terrorist or something? What is it? Am I some kind of terrorist here or something?"

Defendant relies on *People v. Hooper*, 133 Ill. 2d 469, 513 (1989), for the proposition that judicial bias can be shown by a distrust toward the defendant. However, the pertinent issue in *Hooper* was whether the defendant could establish judicial bias against the defendant because of the trial judge's inappropriate comment that he did not agree with a Supreme Court opinion. Our supreme court found in *Hooper* that the defendant could not establish bias on the part of the trial judge because although the judge's comment was inappropriate, the judge did not exhibit "active personal animosity, hostility, ill will or distrust towards the defendant" and did not state that he was unwilling or unable to apply the appropriate law to the case before him. *Hooper*, 133 Ill. 2d at 513.

As noted in *Hooper*, defendant has the burden of establishing a judge's bias or prejudice. *Hooper*, 133 Ill. 2d at 514. We find that here, defendant has fallen short of this burden. The trial court's action of taking away a paper clip from defendant can hardly suffice to establish a bias or distrust toward defendant. Generally, witnesses do not bring items like paper clips to the witness stand when they testify. Perhaps the court merely felt that defendant's fiddling with the paper clip distracted from his testimony. There is no support in the record for defendant's contention that the paper clip was taken from defendant

because it could have been used as a weapon in defendant's hands. We do not find that defendant has established any bias or prejudice.

### 3. Defendant's *Pro Se* Representation

■ Next, defendant contends that the trial court should not have permitted him to represent himself *pro se* because he was not mentally competent to do so. Defendant argues that although he was found mentally competent to stand trial, he was not mentally competent to conduct his own defense. Defendant relies on the recent Supreme Court opinion of *Indiana v. Edwards*, 554 U.S. 164, 171 L. Ed. 2d 345, 128 S. Ct. 2379 (2008). Defendant argues that *Edwards* stands for the proposition that the federal constitution allows for a higher standard than just basic fitness when the defendant chooses to represent himself. Defendant maintains that the trial court should have conducted a separate inquiry or hearing as to whether he was competent to proceed *pro se.*

The issue in *Edwards* concerned a criminal defendant whom a state court found mentally competent to stand trial if represented by counsel but not mentally competent to represent himself *pro se* at trial. The Supreme Court considered whether under these circumstances the Constitution forbade a state from insisting that the defendant proceed to trial with counsel, thereby denying the defendant the right to represent himself. The Court found that it was constitutional for a state to deny the defendant the right to represent himself if the defendant was not mentally competent to do so. *Edwards*, 554 U.S. at 168-69, 171 L. Ed. 2d at 351, 128 S. Ct. at 2382. In reaching this determination, the Court noted its "foundational 'self-representation' case" of *Faretta v. California*, 422 U.S. 806, 45 L. Ed. 2d 562, 95 S. Ct. 2525 (1975), which held that the sixth and fourteenth amendments included a constitutional right to proceed without counsel when a criminal defendant voluntarily and intelligently elects to do so. *Edwards*, 554 U.S. at 170, 171 L. Ed. 2d at 352-53, 128 S. Ct. at 2383. However, the Court made clear that *Faretta* did not answer the question presented in *Edwards* because *Faretta* did not concern a defendant with mental competency issues, or what is sometimes called a "gray-area" defendant. The Court reiterated that the question in *Edwards* concerned whether there was a mental illness related limitation on the scope of the right of self-representation. *Edwards*, 554 U.S. at 171, 171 L. Ed. 2d at 353, 128 S. Ct. at 2384. In finding that it was constitutional to limit this right, the Court reasoned that an individual may well be able to satisfy the mental competence standard to stand trial when represented by counsel, yet may be unable to carry out the basic tasks needed to present his own defense without the help of

counsel. *Edwards*, 554 U.S. at 175-76, 171 L. Ed. 2d at 355, 128 S. Ct. at 2386. The Court also noted that " 'mental illnesses can impair the defendant's ability to play the significantly expanded role required for self-representation even if he can play the lesser role of represented defendant.' [Citation.]" *Edwards*, 554 U.S. at 176, 171 L. Ed. 2d at 356, 128 S. Ct. at 2387. The Court additionally noted that a right of self-representation at trial will not affirm the dignity of a defendant who lacks the mental capacity to conduct his defense without the assistance of counsel. *Edwards*, 554 U.S. at 176, 171 L. Ed. 2d at 356, 128 S. Ct. at 2387.

*Edwards* was decided shortly after defendant's trial, and as defendant points out, the trial court did not have the benefit of its guidance. However, we do not find that *Edwards* requires any different result in this case. As the State notes, *Edwards* did not hold that there was a higher standard of competence requiring an additional inquiry before a trial court permits a defendant to proceed *pro se*. Rather, *Edwards* simply held that a defendant's right to self-representation was not absolute and could be limited if a defendant was not mentally competent to proceed *pro se*, yet was still competent to stand trial with representation.

Defendant maintains that his behavior throughout trial indicated that he was not mentally competent to proceed *pro se*. He argues that his interruptions and comments showed paranoia, including his theory of defense that everyone had tried to frame him, which was not the type of behavior that someone who had the mental capacity to represent himself at trial would exhibit. He also argues that his representation did not affirm his dignity because throughout much of the trial he was admonished by the judge that he was doing something wrong. He further argues that there was evidence that his mental illness had increased in severity over time, which may have impacted his ability to act as his own attorney.

Here, however, we are not convinced that defendant's actions throughout trial were the result of anything other than a nonlawyer defending himself. Defendant was able to perform all the basic tasks during trial including participating in *voir dire*, presenting an opening statement, cross-examining witnesses, testifying on his own behalf and making a closing statement. It is true that defendant was admonished by the trial court when he ventured into topics or areas that were improper; however, a *pro se* defendant is held to the same standards as an attorney. See *Harvey v. Carponelli*, 117 Ill. App. 3d 448, 451 (1983). Regarding defendant's interruptions and comments throughout trial, we do not find them to be evidence of defendant's mental incompetence. We find them to be evidence of defendant's pos-

sible frustration of his lack of legal knowledge or perhaps simply his penchant for sarcasm and mockery. Any lack of dignity was not the result of self-representation, but the result of defendant's lack of self-control to conduct himself appropriately in a courtroom. Regarding defendant's claim that his mental illness had worsened by the time of his trial, we again note that defendant was able to perform all of the necessary tasks that an attorney would perform at trial, albeit not as effectively as an attorney. Perhaps defendant's self-representation was foolish and unwise, yet, the record does not show that it was the result of mental incompetence.

### 4. Closing Argument

■ Next, defendant contends that the State engaged in misconduct during its rebuttal closing argument when it: improperly commented to the jury that defendant did not present an alibi for the date of the offense; accused defendant of choosing to represent himself at trial in order to manipulate the proceedings; and vouched for the credibility of its witnesses.

A prosecutor is given wide latitude in closing arguments and may comment on the evidence, draw inferences therefrom, and comment on the accused's credibility. *People v. Miller*, 302 Ill. App. 3d 487, 495 (1998). Improper comments made during closing arguments do not constitute reversible error unless they substantially prejudice the accused. *People v. Stuckey*, 231 Ill. App. 3d 550, 564 (1992).

### A. Failure to Present an Alibi

Defendant references the State's following comment during rebuttal closing argument.

> "Ladies and gentlemen, consider his testimony. It was 45 minutes of, it wasn't me. Well, let me ask you this. Did he ever tell you where he was that day? In all of that time that he testified, in all of the time that he told you he was framed and a scapegoat[,] *** did he ever tell you where he was? No, he didn't."

Defendant argues that the State's comment shifted the burden of proof to defendant and informed the jury that it should find him guilty because he failed to provide the jury with an alibi.

On direct examination defendant testified in part:

> "I told him no, I had no involvement in it whatsoever. Officer Ernst asked me, he said, were you in the area of Harwood Heights at the time that this took place, and I told Officer Ernst, no and I said I could prove that. I could prove I wasn't even in Harwood Heights. Even though I lived a few houses away from where this happened, I says, I could prove I wasn't even there in the area when this incident happened ***."

Here, we find that the State could fairly comment on defendant's testimony that defendant could prove that he was not in the area of the burglary on the date of the burglary. Defendant stated twice that he could prove that he was not in the area; however, he presented no evidence of his whereabouts during trial. The State's comment was a fair inference from the evidence presented at trial.

## B. Manipulate the Proceedings

Defendant also references as error the State's following comment during rebuttal closing argument.

"[T]he defendant in this case has chosen to represent himself, and that's his right. Don't hold it against him, but for God's sakes, don't hold it against us.

\* \* \*

The defendant in this case has chosen to represent himself in an effort to manipulate—

\* \* \*

The defendant is attempting to manipulate this proceeding to his advantage. Don't you let him do it."

Defendant argues that the State's comment was improper because the comment implied that he should be penalized for exercising his constitutional right to represent himself.

Here, we find no error in the State's comment. As previously noted, defendant continuously spoke out of turn, interrupted the proceedings and was disrespectful to the court. For the State to comment that defendant was seeking some sort of advantage through his self-representation is supported by the record. Had defendant not proceeded *pro se*, he would not have been permitted to address the court, the jury and the State in the manner that he did. By proceeding *pro se*, defendant was essentially seeking to have free rein in the courtroom. Neither an attorney nor a defendant represented by an attorney would have been permitted to repeatedly interrupt the proceedings to comment on the testimony of witnesses or the State's argument, such as defendant did. We find no error in the State's comment.

## C. Credibility of the State's Witnesses

Defendant also argues that the State's following comment in rebuttal closing argument was improper.

"You get to decide who's telling the truth in this case. You get to decide who's lying, and I suggest to you, folks, that if Bernadetta Wolna came in here and lied to you, then let's hand out an Academy Award for best actress because, wow, did she ever do a good job."

Defendant argues that although the credibility of witnesses is a proper subject for comment in closing argument, the comment was improper because the State interjected its personal belief that Bernadetta's testimony was truthful.

Here, the State's comment was not that it personally thought Bernadetta's testimony was truthful. Rather, the comment that Bernadetta would have to be a great actress if she was lying was a fair inference on Bernadetta's testimony and the evidence presented at trial that Bernadetta's identification of defendant was consistent and supported by the evidence presented at trial. Moreover, defendant attacked Bernadetta's credibility on cross-examination and repeatedly argued in his closing argument that Bernadetta's testimony was not to be believed. The State's comment was a fair comment on the evidence.

### 5. Jury Instructions

Next, defendant contends that the trial court erred in giving the jury an improper and confusing instruction regarding a statement made by defendant when the statement had nothing to do with the offense and, as a result, defendant was denied his right to a fair trial.

We review jury instructions for an abuse of discretion. *People v. Sims*, 374 Ill. App. 3d 427, 431 (2007). When deciding whether a trial court abused its discretion, a reviewing court will examine the jury instructions in their entirety, to determine whether they fairly, fully and comprehensively informed the jury of the relevant law. *Schultz v. Northeast Illinois Regional Commuter R.R. Corp.*, 201 Ill. 2d 260, 273-74 (2002). An abuse of discretion occurs only where the trial court's ruling is "arbitrary, fanciful, or unreasonable, or where no reasonable person could take the view adopted by the trial court." *People v. Purcell*, 364 Ill. App. 3d 283, 293 (2006).

The court gave Illinois Pattern Jury Instructions, Criminal, No. 3.06—3.07 (4th ed. 2000) (hereinafter IPI Criminal 4th No. 3.06—3.07) over defendant's objection.

The instruction stated:

> "You have before you evidence that the defendant made a statement relating to the offense charged in the indictment. It is for you to determine whether the defendant made the statement and, if so, what weight should be given to the statement. In determining the weight to be given to a statement, you should consider all the circumstances under which it was made." IPI Criminal 4th No. 3.06—3.07.

The court gave the instruction over defendant's objection, stating that, "[t]here has been evidence in the trial, through the detective that testified, Detective Ernst, that the defendant made a statement

concerning his haircut, and the defendant's cross-examination indicates that the defendant said he did not make that statement, and I believe it's up to the jury to decide these issues."

Defendant maintains that the instruction was improper because his statement regarding his haircut did not "relate" to the offense of residential burglary. He further adds that the error was not harmless because it "served to highlight that piece of circumstantial evidence and could have led the jury to believe that defendant's statement was somehow tantamount to an admission."

Defendant relies on *People v. Cemond*, 242 Ill. App. 3d 1022 (1992). In *Cemond*, the defendant was charged and convicted of the aggravated criminal sexual abuse of a nine-year-old child. At trial, two witnesses testified that defendant told them that the police asked him to find some young girls to go to the prison and have sex with inmates for money. The trial court instructed the jury with IPI Criminal 2d No. 3.06—3.07. This court held on appeal that it was error to give the instruction because the defendant's statement about having sex with inmates did not relate to the charge of aggravated criminal sexual abuse. *Cemond* 242 Ill. App. 3d at 1026. This court also determined, however, that the error was harmless due to any lack of prejudice and the overwhelming evidence of guilt. *Cemond*, 242 Ill. App. 3d at 1026.

■ Here, the instruction only states that the statement must relate to the offense charged. How the statement "relates" to the offense charged is not defined. Defendant would have us interpret "relate" as concerning only those actions that comprised the crime itself. We do not believe that such a narrow interpretation is required. The issue of defendant's haircut was explored by both sides during trial. Although defendant's haircut occurred after the crime was completed, it was relevant to the proceedings. Therefore, we find that the statement concerning defendant's haircut did "relate" to the crime charged. Unlike in *Cemond*, where the defendant's statement was not relevant to the crime charged, testimony regarding defendant's haircut was relevant to the eyewitnesses' identifications of defendant. We find that the trial court did not abuse its discretion in giving the instruction.

## 6. Sentencing

■ Lastly, defendant contends that the trial court's sentence of 28 years was an abuse of discretion. He argues that the sentence was excessive where it was only two years less than the maximum sentence of 30 years and the circumstances of the offense did not warrant such a high sentence. Further, defendant argues that the judge's comments toward him during trial showed that she may have relied on her own prejudice against him in giving him an excessive sentence. Defendant,

who was 53 years old at the time of sentencing, further notes that he will be 67 years old at the time of his release, which effectively negates any possibility of rehabilitation.

During the sentencing hearing, defendant's lengthy criminal background was noted. Defendant had 10 prior felony convictions for various offenses including several burglaries, retail thefts and residential burglaries. The trial court commented that "you have done nothing to society besides harm people, scare people, and make people victims, that's what you have done in this life." The court also stated that none of defendant's prior convictions or time spent in prison had deterred defendant from his life of crime. The court further took note of the many good deeds defendant claimed to have done in his life, including rescuing 13 children from a burning building, rescuing 2 people who had fallen through the ice while snowmobiling, rescuing 2 blind women from a burning building, and rescuing a girl from drowning while he was a lifeguard. The court then imposed a sentence of 28 years.

Sentencing decisions are entitled to great weight and deference. *People v. Latona*, 184 Ill. 2d 260, 272 (1998). In determining an appropriate sentence, the defendant's history, character, rehabilitative potential, the seriousness of the offense, the need to protect society and the need for deterrence and punishment are to be considered. *People v. Lamkey*, 240 Ill. App. 3d 435, 441-42 (1992). When a sentence falls within the statutorily mandated guidelines, we presume it to be proper unless there is an affirmative showing that the sentence varies greatly from the purpose and spirit of the law, or is manifestly disproportionate to the nature of the offense. *People v. Averett*, 381 Ill. App. 3d 1001, 1020-21 (2008). A reviewing court may reduce a sentence imposed by the trial court only when the record affirmatively shows that the trial court abused its discretion. *People v. Perruquet*, 68 Ill. 2d 149, 154 (1977). Absent an abuse of discretion, we should not substitute our judgment for that of the trial court. *People v. Jones*, 323 Ill. App. 3d 451, 460 (2001).

Before imposing sentence, the trial court reviewed defendant's presentence investigation, noting his good deeds as well as his lengthy criminal history, specifically stating that his prior incarcerations had not deterred his criminal conduct. Because of defendant's history, defendant was sentenced as a Class X offender (730 ILCS 5/5—8—1(a)(3) (West 2004)), which carries a sentencing range of 6 to 30 years. Defendant's sentence falls within the range of the statutorily mandated guidelines. We do not believe that his sentence varies greatly from the purpose and spirit of the law or is manifestly disproportionate to the nature of the offense. Although defendant did not harm

676

anyone during the offense, he entered a family's home and ultimately encountered Bernadetta and Adam as they arrived home. This was not a victimless crime; the sanctity of a family's home was breached. Moreover, the fact that defendant might be 67 years old at the time of his release can serve to negate neither the fact that he committed this crime nor the fact that he had an extensive criminal history. We find no abuse of discretion.

Accordingly, the judgment of the circuit court is affirmed.

Affirmed.

HOFFMAN and SOUTH, JJ., concur.