2020 IL App (1st) 181662-U

SIXTH DIVISION
AUGUST 7, 2020

No. 1-18-1662

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 13 CR 8101 |
| | ) | |
| MALCOLM TERRY, | ) | Honorable |
| | ) | Michael McHale, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE CUNNINGHAM delivered the judgment of the court.
Presiding Justice Mikva and Justice Connors concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court did not err during the defendant's trial and so the defendant's conviction for first degree murder is affirmed.

¶ 2    Following a jury trial in the circuit court of Cook County, the defendant-appellant, Malcolm Terry, was convicted of first degree murder and sentenced to 50 years' imprisonment. The defendant now appeals and raises numerous allegations of error by the trial court. For the following reasons, we affirm the judgment of the circuit court of Cook County.

¶ 3                          BACKGROUND

¶ 4     The defendant was charged with the first degree murder of William Thomas. His three co-defendants, Aramis McKinzie, Garlin Minor, and Akeem Simmons, were also charged with first degree murder. The defendant was tried in separate but simultaneous jury trials with co-defendant Simmons and the following evidence was presented.

¶ 5     Tanya Thomas testified that her 74-year-old father, William Thomas, lived near 68th Street and East End Avenue in Chicago. On October 12, 2012, she was notified that her father had been shot and killed while sitting outside near his home.

¶ 6     Theresa Randle testified that, on October 12, 2012, she walked to a store near 68th Street and Stony Island Avenue. When she exited the store, she saw five men walking across the street, including the defendant, whom she recognized from the neighborhood. She testified that the defendant's hairstyle that day was chin-length dreads with blond tips.

¶ 7     Some of the men broke off from the group and continued walking down 68th Street toward East End Avenue, while others remained behind and near an alley. Ms. Randle stood near the group that remained near the alley, which included the defendant. She asked him what was happening, to which he replied, "It's all good."

¶ 8     Ms. Randle saw the two groups of men make hand gestures to each other. She then heard several gun shots. The group that had walked away suddenly ran back toward the alley where the other men and Ms. Randle were standing. Once the entire group of five men were together again, they all ran away in the opposite direction. Ms. Randle continued walking in the direction of East End Avenue, the direction from which the group of men had come. She saw an "old man laying on the ground." Ms. Randle spoke with police at the scene and again later that same day when a

detective came to her home.

¶ 9 A few days after the shooting, on October 18, 2012, Detective Robert Garza came to Ms. Randle's home and showed her a photo array. She did not identify anyone from the photo array. On October 23, 2012, Detective Garza returned to Ms. Randle's home with more photo arrays. She identified the defendant in the photo array as the man who had remained near the alley with the second group and who had talked to her just before the shooting. On March 1, 2013, Ms. Randle viewed two lineups and another photo array at the police station but did not identify anyone. On March 23, 2013, she viewed another lineup and identified the defendant as one of the men who had stayed near the alley just before the shooting. She also identified him as the person who had told her, "It's all good."

¶ 10 The State asked Ms. Randle if there was a traffic light near 68th Street and Stony Island Avenue where she had been standing with the defendant and other men who remained near the alley. She testified that there was not a traffic light there and that she never told anyone that there was one. On cross-examination, defense counsel attempted to impeach Ms. Randle on the basis that she had testified before the grand jury that there was a traffic light near 68th Street and Stony Island Avenue, as well as on the basis that the person she identified in the photo array as the defendant did not have blond tips in his hair. The State objected numerous times during defense counsel's attempt to impeach Ms. Randle. The trial court sustained all of the State's objections, "as to form."

¶ 11 Defense counsel continued trying to impeach Ms. Randle and eventually the trial court ordered a sidebar outside the presence of the jury. The following colloquy ensued:

"[THE STATE]: Judge, I'm going to object because

[defense counsel]'s not laying the proper foundation.

THE COURT: Yeah. If you're trying to do some impeachment, you're really not doing it the right way, [defense counsel].

[DEFENSE COUNSEL]: All right. I'll go further.

THE COURT: You can't just ask her blanket questions, Did you say this, or Did you say that? If there's something to impeach her with, get to it.

[DEFENSE COUNSEL]: Okay.

THE COURT: You've got to lay the proper foundation."

¶ 12    The trial then continued in the presence of the jury. Defense counsel asked Ms. Randle: "On *** October 12[ ], 2012, did you tell Detective Garza or the other detective with him that the person that you claim to have identified had blond tips at the time?" The State objected and the trial court called another sidebar outside the presence of the jury. During the sidebar, the trial court told defense counsel: "I don't know where you're going. There is no impeachment by omission, so stop it."

¶ 13    Defense counsel continued questioning Ms. Randle in the presence of the jury. When he attempted to impeach her again about the blond tips issue, the State objected a few times. The trial court again sustained the objections "as to form." The trial court finally called a third sidebar outside the presence of the jury. During that sidebar, the court told defense counsel, how to lay a proper foundation. Back in the presence of the jury, defense counsel concluded cross-examining Ms. Randle.

¶ 14     The State then called co-defendant Simmons to testify. Simmons, along with the other two co-defendants, McKenzie and Minor, had been given use immunity for the defendant's case.[1] After Simmons was sworn in, the following exchange occurred:

"[THE STATE]: Sir, I'm going to ask you a couple of questions about yourself. All right? Can you please state your name for the record?

[SIMMONS]: (No response.)

THE COURT: Answer the question, Mr. Simmons.

[THE STATE]: All right, sir. I'm going to ask you about a couple other things. You're in Cook County Jail now, right?

[SIMMONS]: (No response.)

THE COURT: Mr. Simmons, I'm ordering you to answer the question.

THE STATE: You're standing trial today in this case, is that correct, with a different jury?

[SIMMONS]: (No response.)

[THE STATE]: I want to talk to you about the date of February 28, 2013, just about 2:00 o'clock in the morning. You were arrested that day for this case; is that correct?

[SIMMONS]: (No response.)

---

[1]When a witness has *use* immunity, his testimony is compelled and may not be used against him in his own prosecution. *People v. Hamm*, 136 Ill. App. 3d 11, 22 (1985). Witnesses given use immunity do not have fifth amendment privileges. See *People v. Zambrano*, 2016 IL App (3d) 140178, ¶ 24.

THE COURT: Okay, I think that's as far as we're going to

go."

At that point, the jury was removed from the courtroom. The trial court asked Simmons if he had "any intention of answering the questions," to which Simmons answered, "No." The trial court then held Simmons in contempt of court.

¶ 15    Co-defendant McKinzie was sworn in next and the following colloquy took place:

"[THE STATE]: Sir, in a loud voice, can you state your

name and spell your first and last name?

[MCKINZIE]: (No response.)

[THE STATE]: Are you Aramis McKinzie?

[MCKINZIE]: (No response.)

THE COURT: Answer the question, sir.

[THE STATE]: Are you currently in Cook County Jail?

[MCKINZIE]: (No response.)

[THE COURT]: You are ordered to answer the question, sir.

[THE STATE]: How old are you?

[MCKINZIE]: (No response.)

[THE STATE]: Are you charged along with Malcolm Terry

and Akeem Simmons in this murder?

[MCKINZIE]: (No response.)"

The jury was then removed from the courtroom. After a discussion off the record, the trial court asked McKinzie if he understood that he did not have a right under the fifth amendment to refuse

to testify, to which McKinzie answered, "Yes." The trial court explained to McKinzie that it was going to hold him in contempt if he refused to testify. McKinzie stated that he understood but he still refused to testify. The trial court held him in contempt of court.

¶ 16    Next, co-defendant Minor was called as a witness. Before being sworn in and outside the presence of the jury, the trial court asked Minor if he understood that, because of his use immunity, he did not have a fifth amendment right and that anything he said on the stand could not be used against him in his case. Minor stated that he understood. The trial court also asked Minor if he understood that, if he refused to testify, he could be held in contempt of court and sentenced. Minor again stated that he understood. The jury was then brought into the courtroom. When Minor was called to testify, he refused to be sworn in. Later, outside the presence of the jury, Minor was held in contempt of court.

¶ 17    The parties stipulated that Dr. Ponni Arunkumar, an assistant examiner in the Cook County Medical Examiner's Office, conducted an autopsy on the victim, Mr. Thomas. The external examination revealed a gunshot entrance wound to the back of Mr. Thomas' head. There was no evidence of close-range firing.

¶ 18    The State then introduced a stipulation that co-defendant Simmons had a tattoo of the words "Hood Gang" on the right side of his neck. The defendant objected to the tattoo stipulation, stating that he thought the tattoo evidence would only be introduced in front of Simmons' jury, and not the defendant's jury, as it had "zero relevance" to the defendant's case. The State responded that the tattoo was evidence of gang membership. The State explained that Simmons' gang tattoo was relevant to the defendant's case since this was an accountability case and the State's theory was that the defendant and his co-defendants killed Mr. Thomas during a gang-

retaliation shooting. The trial court stated: "It's circumstantial evidence. It's an accountability case. So if you don't want to stipulate, the State will call the witnesses, and that's my ruling." The court then allowed the stipulation evidence of Simmons' tattoo.

¶ 19    The State requested a three-day continuance to investigate why the three co-defendants refused to testify and to give them a chance to reconsider. Over the defendant's objection, the trial court granted the three-day continuance.

¶ 20    Following the three-day continuance, the State filed a motion to admit evidence of prior statements pursuant to the doctrine of forfeiture by wrongdoing.[2] The motion sought to introduce videotaped statements that all three co-defendants gave to the police. In the videotaped statements, the co-defendants all admitted to inadvertently killing Mr. Thomas when they went to shoot rival gang members as retaliation for one of their gang members being beat up earlier that day. In each videotaped statement, the co-defendants implicated the defendant's involvement, including that he provided the gun used in the shooting.

¶ 21    The motion argued that the trial court should admit the videotaped statements into evidence pursuant to the doctrine of forfeiture by wrongdoing because it was clear that the defendant's "coordination, knowledge, and intent" rendered his three co-defendants unavailable to testify. The motion explained that an officer had searched the defendant's cell and discovered four "kites," jail terminology for small pieces of paper containing information passed between inmates. Copies of the kites were attached to the motion. Three of the kites were written to the defendant's nickname from co-defendant Simmons' nickname. In the first kite, Simmons asked the defendant for drugs

---

[2]Forfeiture by wrongdoing is a hearsay exception that allows a statement offered against a party when that party "has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness." Illinois Rule of Evidence 804(b)(5) (eff. Jan. 1, 2011).

and telephone time, and repeatedly told the defendant that he loved him. In the second kite, Simmons told the defendant that he loved him after receiving his "scribe and those drugs." Simmons also referenced "Bam," the nickname of a person referenced in discovery as one of the defendant's associates. In the third kite, Simmons told the defendant to stop talking to Bam and other inmates about their case because "that's shit for us to discuss."

¶ 22   The fourth kite found in the defendant's cell was written in a different handwriting than the other three kites. That kite stated that some negotiations were going on between the State, a person named "A," and the author of the kite. The State's motion alleged that the message in the kite accurately reflected negotiations between the State and co-defendants Aramis McKenzie and Garlin Minor. The fourth kite ended with:

> "but I don't know about A.M. G I know he [is] not ready for that shit. I'm not going to do shit in to [*sic*] I here [*sic*] from you [first] and let me know what you think I should or not. Get back at me A.S.A.P. and don't forget when you do go home don't forget to come back in stand on that business for us. Low City Hood Gang 3L'Z."

¶ 23   The motion further stated that another kite had been found in co-defendant Minor's cell, which read: "On advice of counsel, I hereby exert my right to remain silent under the 5th Amendment to the U.S. Constitution in Article I section 10 of the Illinois Constitution."

¶ 24   Two days later, the State filed a supplemental motion to admit evidence of prior statements. The supplemental motion detailed several recorded telephone calls that the defendant had made from jail. In one of the telephone calls, the defendant said:

> "From what my co-defendants told me, they think they're
>
> trying to trick them and they have no intention of incriminating
>
> themselves. They've already turned down their deals; they don't
>
> want anything to do with this case. They trying to trick them so
>
> they trying to trick me."

In another telephone call, the defendant said:

> "My co-defendants signed the papers to take the charge so
>
> they wouldn't have to take the stand and lie on me. It would have
>
> been a really good time for [my attorney] to come so we can go to
>
> trial and get this over with."

The supplemental motion argued that, "In the defendant's jail calls, he repeatedly demonstrates his knowledge that his co[-]defendants will not testify against him." The State averred that, coupled with the kites, the recorded telephone calls showed that the defendant had coordinated with his three co-defendants to have them "remain[ ] completely mute" for his benefit.

¶ 25     Following a hearing on the State's motion to admit evidence of prior statements, the trial court granted the motion. The trial court found that the first three kites were clearly written from co-defendant Simmons to the defendant, and showed that the defendant "routinely sends Mr. Simmons drugs and phone time, both things that have obvious value, if not an outright bribe, it certainly is a powerful circumstantial evidence inducing him to [not] testify." The trial court further found that the fourth kite discovered in the defendant's cell was from co-defendant Minor, which showed that the co-defendants were taking directions from the defendant and they were trying to help the defendant "beat[ ] this case." Additionally, the trial court found that the recorded telephone

calls the defendant made from jail "certainly make it clear that he knew well in advance of trial that the three co-defendants were not going to testify, which corroborates the notes found in his cell." The trial court ultimately held that it was "certainly more likely than not" that the defendant procured or acquiesced in the unavailability of the three co-defendants as witnesses.

¶ 26    The trial then resumed. The trial court asked the three co-defendants if they had changed their minds and were willing to testify in the defendant's case. They all said no.

¶ 27    Sergeant Velma Guerrero testified that she interviewed co-defendant McKinzie at the police station on February 28 and March 1, 2013. Sergeant Guerrero identified the videotaped recording of McKinzie's interview, as well as the transcription of the recording. Detective Scott Reiff testified that he interviewed co-defendant Simmons at the police station on February 28 and March 1, 2013. Detective Reiff identified the videotaped recording of Simmons' interview, as well as the transcription of the recording. Detective Garza testified that he also interviewed co-defendants McKinzie and Simmons, and identified the recordings and transcriptions.[3] The State submitted the videotaped statements and transcriptions for admission into evidence. Published clips were played for the jury, in which the three co-defendants admitted that the victim, Mr. Thomas, was killed during their gang-retaliation shooting and their statements implicated the defendant in the shooting.[4]

¶ 28    The State then rested. The defendant's motion for a directed verdict was denied.

¶ 29    Kenneth Webb, president of Fact Finders Group investigative agency, testified on behalf of the defendant. He was hired by defense counsel to conduct an investigation into the shooting of

---

[3]Although co-defendant Minor also had a videotaped statement and transcription which was admitted into evidence, the record reflects that no one testified as to interviewing him.

[4]The videotaped statements and transcriptions are not included in the record on appeal. However, the parties do not dispute the contents of the videotaped statements.

Mr. Thomas. As part of his investigation, several of his investigators interviewed Ms. Randle. He also went to the intersection of 68th Street and Stony Island Avenue several times and never saw a traffic light there.

¶ 30    The defendant rested and the parties made their closing arguments. The jury deliberated and found the defendant guilty of first degree murder.

¶ 31    Following the verdict, the trial court allowed defense counsel to withdraw as the defendant's counsel and allowed new counsel to file an appearance on the defendant's behalf.

¶ 32    On April 18, 2018, co-defendant Simmons filed a motion for substitution of judge and the defendant joined the motion. The motion attached an affidavit from Leah Thigpen, the defendant's aunt. In her affidavit, Ms. Thigpen testified that, on August 22, 2017, she was sitting in court prior to jury selection for the defendant's trial. None of the defendants or their attorneys were in the courtroom. Assistant State's Attorney (ASA) Martin approached the judge's bench and began having a conversation with the trial judge. Ms. Thigpen overheard some of their conversation, including the trial judge saying: "this code of silence bullshit I'm sick of it," "this won't matter at sentencing," "20," and "I don't believe him either." Her affidavit stated it was clear that the trial judge and ASA Martin were talking about the defendant and his case.

¶ 33    Ms. Thigpen's affidavit further testified that later in the day on August 22, 2017, still prior to jury selection, the venire left for lunch. The State then informed the trial court that a family member of the defendant was in the gallery. The trial court called Ms. Thigpen up and asked her about her relationship to the defendant. The court then told her that she could stay, but to not have any contact with the potential jurors. Ms. Thigpen decided it was best to leave for the jury selection.

¶ 34 A hearing was held on the defendant's motion for substitution of judge, with a different judge presiding. During the hearing, Ms. Thigpen testified to the contents of her affidavit. On cross-examination, she acknowledged that during the conversation she overheard the trial judge having with ASA Martin, she never heard a specific reference to the defendant or any of his co-defendants.

¶ 35 ASA Martin testified that he did not have any recollection of the *ex parte* conversation alleged by Ms. Thigpen. He testified that it was likely she overheard him talking to the trial judge about scheduling or about when co-defendant Simmons was taken to the hospital.

¶ 36 Following arguments, the substitution-motion judge ruled that, considering the totality of the circumstances, there was insufficient evidence to show that the trial judge presiding over the defendant's case was biased against the defendant. The substitution-motion judge denied the defendant's motion, and the case was transferred back to the original trial judge.

¶ 37 Back in front of the original trial judge, the defendant filed a motion for a new trial. His motion for a new trial incorporated his arguments from his motion for substitution of judge and attached Ms. Thigpen's affidavit. His motion argued that there was at least the appearance of impropriety and so he should be granted a new trial. His motion further argued that his co-defendants were improperly questioned in front of the jury and that he had been unfit to stand trial because his psychotropic medicine was discontinued the first day of trial, causing him to suffer psychotic effects.

¶ 38 In response, the State called Dr. Jonathan Howard, the correctional psychiatrist who treated the defendant during his trial. Dr. Howard ultimately diagnosed the defendant with a mood disorder that generally would not render a person unfit to stand trial. He testified that the defendant

did not suffer from bipolar disorder, even though he had previously been diagnosed with it. Two other doctors also interviewed the defendant and diagnosed him with a mood disorder. Dr. Howard prescribed Depakote, an anticonvulsant used to treat bipolar disorder, and Trazodone, an antidepressant, for the defendant's mood disorder.

¶ 39 On June 12, 2013, about two months prior to the defendant's trial, the defendant met with another doctor and refused consent for Depakote, so the medication was discontinued. Instead, the defendant specifically requested Gabapentin, another anticonvulsant. Dr. Howard explained that Gabapentin is highly sought after by inmates and there is a concern for abuse of it in the jail setting, whereas there is no concern for abuse of Depakote because it does not give a sense of euphoria when it is abused. Another doctor prescribed Venlafaxine, an antidepressant, to the defendant on a temporary basis for 3 to 6 months at a time, even though there is also a concern for abuse with that drug. The defendant continued to request Gabapentin and threatened to sue if it was not prescribed.

¶ 40 Dr. Howard further testified to specific drug-seeking behavior by the defendant, such as: complaining about not getting Venlafaxine; asking for a maximum dose of Benadryl, which also has a high concern of abuse in jail; and threatening to kill himself if he was not prescribed Gabapentin.

¶ 41 The month before the defendant's trial, he refused to take Venlafaxine and continued to refuse it throughout the trial. During the trial, the defendant received Gabapentin, as well as Mirtazapine, an antidepressant which helps with sleep. Dr. Howard explained that withdrawal symptoms from the discontinuation of Venlafaxine may include headaches, sweating, sleep disturbances, mild tremors, tingling in the neck, and increased anxiety. He further testified that

those symptoms would have been mitigated in the defendant, by the Gabapentin and Mirtazapine which he was also taking.

¶ 42    On cross-examination, Dr. Howard testified that Venlafaxine discontinuation symptoms can start anywhere from six hours to two days after a missed dose. Dr. Howard stated that the effects of discontinuation syndrome are quite varied among patients, but could be so severe that it could affect fitness to stand trial.

¶ 43    Nurse Kaminski, a nurse at Cook County Jail, testified that her duties include administering medications to inmates. She testified that there were two instances where she made a note that the defendant was hoarding Gabapentin and Venlafaxine.

¶ 44    Deputy Esther Jones testified that she was assigned to the courtroom for the defendant's case. One day, prior to trial, she saw the defendant and co-defendant McKinzie run into each other in the lock-up and pass something between them. Deputy Jones did not see what was passed, but McKinzie took the item and stuffed it into his jumpsuit. Video surveillance showed that McKinzie was patted down over his clothes, but that nothing was recovered.

¶ 45    Joseph Danzel testified that he is employed by the Cook County Sheriff's Office as a court liaison. One day he was called to the courtroom in which a matter related to the defendant's case was being heard. He spoke with a female deputy, as well as the defendant. Thereafter, Danzel recovered two pills wrapped in a piece of paper from within the grated door of the lock-up. The defendant claimed it was his medication, but Danzel testified that inmates are not allowed to carry medication. The pills recovered were Gabapentin and Venlafaxine.

¶ 46    Following arguments on the defendant's motion for a new trial, the trial court rejected the defendant's allegations in the motion, except for the issue of his fitness to stand trial. Regarding

the allegation of *ex parte* communication with ASA Martin, the trial court noted that Ms. Thigpen's affidavit came one month after her observations and the guilty verdict. The trial court further noted that because Thigpen is a family member of the defendant, "that does inherently include some degree of bias and lack of credibility based on that relationship." The trial court stated that Ms. Thigpen "acknowledges she [was] only hearing snippets of conversation, at best" and that "those snippets, they don't appear to be logically tied together at all." The trial court stated that it did not recall making any comments about the "code of silence," but even if it had, the comments did not demonstrate bias standing alone.

¶ 47    While the trial court stated that, based on the five years it had been observing the defendant, it had "no *bona fide* doubt of his fitness, none whatsoever," it nonetheless ordered a retrospective fitness to stand trial evaluation "out of an abundance of caution."

¶ 48    Dr. Nishad Nadkarni, a forensic psychiatrist at Cook County Forensic Clinical Services, testified that he was asked to complete a retroactive fitness evaluation of the defendant for the time of trial. This included reviewing the defendant's medical records and the transcripts from the trial. Dr. Nadkarni also attempted to interview the defendant, but the defendant was uncooperative and verbally combative. Based on his review of all the data and his personal contact with the defendant, Dr. Nadkarni found no signs or symptoms of a *bona fide* major mental illness, cognitive impairment, or any kind of medical issues related to the administration or withdrawal of any psychotropic medication. He testified that while there was no evidence that the defendant had been unfit to stand trial, he was unable to render an opinion; due, in part, because he was unable to complete his evaluation interview with the defendant.

¶ 49    The defendant testified that he was not trying to be difficult during his interview with Dr. Nadkarni, but that he had been confused. He stated that he would cooperate with another evaluation interview if the trial court ordered it. The defendant further testified that he did not understand the trial. During the trial, he was soaking wet from sweating, did not sleep, had nightmares, vomited, had diarrhea, and needed bathroom breaks but did not get them. He did not remember much about the trial. He had wanted to testify during it, but he "wasn't in a position to" and "wouldn't have been able to articulate" well.

¶ 50    During arguments on the defendant's motion for a new trial, defense counsel requested another fitness evaluation since Dr. Nadkarni could not render an opinion regarding the defendant's fitness. The trial court denied the defendant's request for another fitness evaluation, stating that the defendant's testimony was "self-serving and incredible." The trial court explained that the "defendant is presumed fit" and that he had failed to meet his burden of showing a *bona fide* doubt of his fitness. The trial court denied the motion for a new trial.

¶ 51    The defendant was subsequently sentenced to 50 years' imprisonment. This appeal followed.

¶ 52                                    ANALYSIS

¶ 53    We note that we have jurisdiction to review the trial court's judgment, as the defendant filed a timely notice of appeal. Ill. S. Ct. R. 603 (eff. Feb. 6, 2013); R. 606 (eff. July 1, 2017).

¶ 54    The defendant makes numerous, overlapping arguments on appeal, mainly contending that he received an unfair trial. His arguments amount to the following issues: (1) whether an appearance of impropriety existed in the trial because of the trial judge's alleged *ex parte* communication; (2) whether the trial judge made improper comments that prejudiced the

defendant during the court's rulings on objections; (3) whether the trial court erred in allowing the State to admit evidence of co-defendant Simmons' gang tattoo; (4) whether the trial court erred in allowing the three co-defendants to be questioned in front of the jury; (5) whether the State's continued questioning of the three co-defendants violated the confrontation clause; (6) whether the defendant was denied his sixth amendment right to confront witnesses when the trial court allowed the State to introduce videotaped statements of his three co-defendants; and (7) whether the trial court erred in denying the defendant's motion for a new trial on the basis that he was unfit to stand trial. We take each issue in turn.

¶ 55    The defendant first argues that the trial judge engaged in an inappropriate *ex parte* communication with the State when the defendant's aunt, Leah Thigpen, overheard the judge saying: "this code of silence bullshit I'm sick of it," "this won't matter at sentencing," "20," and "I don't believe him either." He claims that, at the very least, this gave the appearance of impropriety which warrants a new trial.[5] [6]

¶ 56    A trial judge must avoid both impropriety and the appearance of impropriety. *People v. Taylor*, 288 Ill. App. 3d 21, 27 (1997). Supreme Court Rule 62(A) provides that a "judge should respect and comply with the law and should conduct himself or herself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." Ill. S. Ct. Rule 62(A), canon 2 (eff. Oct. 15, 1993). Pursuant to Rule 63(A)(5), "a judge shall not initiate, permit,

---

[5]We note that, while the defendant raised this alleged *ex parte* communication in his motion for substitution of judge, he does not challenge the judgement entered on that motion.

[6]The defendant also argues that the trial court engaged in a second inappropriate *ex parte* communication when the State emailed its supplemental motion to admit evidence of prior statements to the trial court and defense counsel, and the trial court responded to the email that it had "listened to the recordings" of the telephone calls and that "the summary [by the State] appears to be accurate." However, the defendant has raised this argument for the first time on appeal, and it is therefore forfeited. *People v. Cherry*, 2016 IL 118728, ¶ 30. We note, nonetheless, that this argument is meritless.

or consider *ex parte* communications, or consider other communications made to the judge outside the presence of the parties concerning a pending or impending proceeding," except for scheduling and other administrative purposes. Ill. S. Ct. Rule 63(A)(5), canon 3 (eff. Feb. 2, 2017). When determining whether an appearance of impropriety exists with respect to a judgment entered by the trial court, a reviewing court must ask whether an objective observer could reasonably believe that the judgment was improperly influenced by matters that should not have been considered. See *In re Marriage of Wheatley*, 297 Ill. App. 3d 854, 857 (1998).

¶ 57    The only evidence in support of the defendant's argument that there was an appearance of impropriety is Ms. Thigpen's affidavit. Not only is she a relative of the defendant, but she also waited until *after* the guilty verdict -- over a month after her alleged observations -- to produce an affidavit. This weighs against the credibility of the statements in her affidavit. Further, the defendant's assertion that the trial judge was talking about his case, and doing so in a way that showed bias, is purely speculative. Ms. Thigpen's affidavit did not include any identifying language which indicated that the judge was talking about a specific case, let alone the defendant or his case. Under these facts and circumstances, it cannot be said that an objective observer could reasonably believe that the judgment in this case was improperly influenced by matters that should not have been considered. And while we are not reviewing the judgment denying the defendant's motion for substitution of judge, the fact that the motion-substitution judge found no bias or impropriety based on this alleged *ex parte* communication weighs heavily in support of our conclusion. We accordingly reject the defendant's argument that he is entitled to a new trial because there was an appearance of impropriety during his trial.

¶ 58    The defendant next argues that the trial judge made improper comments that prejudiced

him during the court's rulings on objections. To be clear, the defendant does not argue that the trial court made improper objection rulings. Instead, he claims that, during defense counsel's impeachment of Ms. Randle, the trial judge made rulings on objections accompanied by commentary which showed bias in favor of the State. The defendant avers that the trial judge acted as an adversary in the case and chastised defense counsel in front of the jury. The defendant argues that this prejudiced him.

¶ 59    Every defendant has a constitutional right to a fair trial before an unbiased and open-minded trier of fact. U.S. Const., amends VI, XIV; Ill. Const. 1970, art. I, § 8; *People v. Taylor*, 357 Ill. App. 3d 642, 647 (1990). This includes being entitled to a trial that is free from improper and prejudicial comments from the trial judge. *People v. Heidorn*, 114 Ill. App. 3d 933, 936 (1983). "The trial judge has wide discretion in presiding over a trial, but cannot make comments or insinuations indicating its opinion on the credibility of a witness or the argument of counsel." *People v. Tatum*, 389 Ill. App. 3d 656, 662 (2009). The trial judge must exercise a high degree of care to avoid influencing the jury in any way. *Id.* However, even when a trial judge does make improper comments, those comments will only constitute reversible error if the remarks were prejudicial. *Id.*

¶ 60    The defendant takes issue with the trial judge's comments made during defense counsel's impeachment of Ms. Randle. The defendant relies upon *People v. Wiggins*, 2015 IL App (1st) 133033, in which this court found that the trial court in that case acted as an arbiter for the State by interposing objections on behalf of the State, sustaining his own objections, and completing the State's examination of a witness. In so holding, this court found that the trial court "further indicated to the jury a preference for the [State]" when it said to defense counsel, "watch yourself,

man," and when it referred to the State's redirect examination of a witness as "what we just did." *Id.* at ¶ 50. The same behavior cannot be said to have occurred in this case. Here, in response to the objections, the trial judge merely stated, "sustained" or "sustained as to form" and did not add any additional commentary.

¶ 61 It is clear from reading the transcript that defense counsel was having trouble laying the proper foundation for impeachment. That was a shortcoming on defense counsel's part. Simply because the trial judge sustained all of the State's objections during that time does not mean that the trial judge acted as an adversary. The record reveals that the objections were properly sustained. And while it is not incumbent for a trial judge to go beyond its ruling, the trial judge here did hold several sidebars in which it explained to defense counsel, how to lay the proper foundation. It is arguable that during the side bars the trial judge showed some frustration with defense counsel's inability to grasp some basic concepts. Nevertheless, judicial frustration in this context with defense counsel's unfamiliarity with a basic evidentiary tenet is not evidence of bias. *People v. Lopez*, 2012 IL App (1st) 101395, ¶ 97.

¶ 62 More importantly, the sidebars occurred *outside the presence of the jury*. In support of his argument, the defendant cites to *People v. Lewerenz,* 24 Ill. 2d 295 (1962) and *People v. Marino*, 414 Ill. 445, 451 (1953), cases that found that the trial judge made improper comments which prejudiced the defendant. Those cases are inapplicable, as they involved comments the trial judge made *in front of the jury*. Even assuming *arguendo* that the trial judge in this case showed frustration with defense counsel and chastised him, it could not have prejudiced the defendant because the jury did not see it. Stated another way, none of the trial judge's comments that the defendant claims showed bias were made in the presence of the jury, so they could not have had

an effect on the jury's verdict. See *People v. Jimerson*, 404 Ill. App. 3d 621, 629 (2010) (improper comments or hostility from the trial judge will only rise to reversible error if the defendant can show that the comment or hostility was a material factor in his conviction). Accordingly, we reject the defendant's argument that the trial judge made improper, prejudicial comments.

¶ 63    Next, the defendant argues that the trial court erred in allowing the State to introduce evidence of co-defendant Simmons' gang tattoo. Specifically, the defendant claims that Simmons' gang tattoo was improperly introduced during his trial because it had no relevance to the defendant's case when there was no other evidence that the defendant was affiliated with a gang.

¶ 64    "Relevant evidence is 'evidence having any tendency to make the existence of a fact that is of consequence to the determination of the action more or less probable than it would be without the evidence.' " *People v. Roman*, 2013 IL App (1st) 110882, ¶ 23 (quoting *People v. Gonzalez,* 142 Ill. 2d 481, 487–88 (1991)). This includes any evidence which tends to show that the defendant had a motive for killing the victim. *Id*. Generally, evidence that a defendant was involved in gang-related activities is admissible to show a common purpose or design or to provide a motive. *Id.*, ¶ 24. It is the function of the trial court to weigh the probative value of the evidence against the risk of prejudice and we will not overturn a trial court's decision on that balancing process absent a clear abuse of discretion. *Id.*, ¶ 23.

¶ 65    In this case, the State's theory was that the defendant and his co-defendants inadvertently shot and killed Mr. Thomas in the process of a retaliation shooting directed at a rival gang. In light of the State's theory, evidence of co-defendant Simmons' gang tattoo is relevant. See *People v. Smith*, 141 Ill. 2d 40, 58 (1990) (sufficient proof of evidence indicating that the defendant was involved in gang-related activity is admissible to show common purpose or design). Moreover, the

State proceeded on an accountability theory, meaning that the defendant and his co-defendants were responsible for each other's actions thereby, rendering Simmons' gang tattoo even more relevant. The trial court decided that the probative value of Simmons' gang tattoo outweighed the risk of prejudice against the defendant. We do not find that decision to be an abuse of discretion.

¶ 66    Turning to the defendant's next argument, he claims that the trial court erred in allowing his three co-defendants to be questioned in front of the jury. He argues that the trial court knew ahead of time that the three co-defendants intended to remain silent on the witness stand, but still allowed the State to question them in front of the jury. The defendant asserts that this "invited the improper inference of a conspiracy" and prejudiced him.

¶ 67    A trial court's decision to allow a witness to testify is an evidentiary ruling, which we review using the abuse-of-discretion standard. *People v. Calabrese*, 398 Ill. App. 3d 98, 124 (2010). An abuse of discretion occurs if the State makes an obvious attempt to build its case out of inferences arising from the witness' refusal to testify. *Id*.

¶ 68    It is improper for a party to call a witness whom he has reason to believe will invoke fifth amendment privilege before the jury and refuse to testify. *People v. Human*, 331 Ill. App. 3d 809, 819 (2002). However, there is nothing in the record in this case to indicate that either the State or the trial court knew beforehand that the three co-defendants were planning to refuse to testify. This is especially true because the three co-defendants had use immunity and therefore *did not have fifth amendment privileges* for purposes of testifying in this case. See *Zambrano*, 2016 IL App (3d) 140178, ¶ 24 (the State can seek a grant of use immunity for a witness who has refused or is likely to refuse to testify on the basis of his fifth amendment rights). "Where a grant of immunity is given, the [State] has the right to demand and expect the witness' testimony, even under compulsion by

the court if necessary." *People v. Evans*, 2016 IL App (3d) 140120, ¶ 47. Indeed, the trial court explained to all three co-defendants that they did not have fifth amendment privileges and could be held in contempt of court, and even gave them multiple chances to testify, but they still refused. Under these facts and circumstances, it cannot be said that the trial court abused its discretion in allowing the State to call the three co-defendants as witnesses.

¶ 69 Nonetheless, the defendant next argues that the State's continued questioning of his co-defendants violated the confrontation clause. He claims that when the State continued questioning the co-defendants even though they did not answer, it was akin to the State testifying, which violated his right to confront the witnesses testifying against him.

¶ 70 Under the confrontation clause of the sixth amendment of the U.S. Constitution, a defendant being accused has the right to confront witnesses against him. U.S. Const., amend. VI. The confrontation clause may be violated if the State questions a witness on material issues even though the witness refuses to testify, as it acts as the equivalent of the State testifying to the questions being asked. *Evans*, 2016 IL App (3d) 140120, ¶¶ 51-52 (citing *Douglas v. Alabama,* 380 U.S. 415 (1965)). We review a defendant's claim that his rights under the confrontation clause were violated *de novo*. *Id.*, ¶ 28.

¶ 71 When the State questioned co-defendants Simmons and McKinzie,[7] it only asked them preliminary background questions, such as their names and whether they were currently in jail. The State did not ask them any questions of evidentiary value which would be akin to the State testifying to the facts of the case. See *Evans*, 2016 IL App (3d) 140120, ¶ 52 (it is improper for the State to present a version of the crime to the jury through questioning a witness who refuses to

---

[7]The State did not question co-defendant Minor at all as he refused to be sworn in.

testify). Accordingly, there was no confrontation clause violation.

¶ 72    The defendant also argues that he was denied his sixth amendment right to confront witnesses when the trial court allowed the State to introduce videotaped statements of his three co-defendants. He avers that the State's motion to admit evidence of prior statements pursuant to the doctrine of forfeiture by wrongdoing was based on "imagined evidence." He claims that it was improper for the trial court to "assume[ ] *** that, since the actions of the [three co-defendants] appeared to be intended to benefit [the defendant]," the defendant must have told them not to testify.

¶ 73    The forfeiture by wrongdoing doctrine provides that if a witness is absent by the defendant's own wrongful act, the defendant cannot later complain if competent evidence is admitted to substitute for the witness' testimony. *People v. Hanson*, 238 Ill. 2d 74, 96 (2010). The doctrine is aimed at removing the otherwise powerful incentive for defendants to intimidate, bribe, and kill witnesses against them. *People v. Perkins*, 2018 IL App (1st) 133981, ¶ 81 (quoting *Giles v. California*, 554 U.S. 353, 374 (2008)). It is grounded in the ability of courts to protect the integrity of judicial proceedings. *Id.* The forfeiture by wrongdoing doctrine serves as an exception to the hearsay rule and also extinguishes confrontation clause claims. *Hanson*, 238 Ill. 2d at 96 (citing *Crawford v. Washington,* 541 U.S. 36, 62 (2004)). See also *People v. Nixon*, 2016 IL App (2d) 130514, ¶ 48 (under the forfeiture by wrongdoing doctrine, a defendant who causes the absence of a witness by wrongdoing, forfeits the constitutional right to confrontation). When the State raises the doctrine of forfeiture by wrongdoing, it must prove, by a preponderance of the evidence, both the wrongdoing and the intent to cause the unavailability of the witness. *Id.* A trial court's ruling to admit evidence pursuant to forfeiture by wrongdoing is an evidentiary ruling and

it will not be disturbed on appeal absent an abuse of discretion. *Id.*, ¶ 50.

¶ 74    We find that the State met its burden in this case by a preponderance of the evidence showing a concerted, collaborative effort by the defendant to keep his three co-defendants from testifying against him. The kites found in the jail cells reflected negotiations between the defendant and his co-defendants. Particularly, three kites found in the defendant's cell showed that he offered co-defendant Simmons drugs and telephone time in return for Simmons' refusal to testify. Likewise, the other kites showed that the defendant coached co-defendant Minor on refusing to testify. See *People v. Stechly*, 225 Ill. 2d 246, 272 (2007) (conduct through which a defendant seeks to undermine the judicial process and cause a witness to be unavailable will constitute forfeiture by wrongdoing). Additionally, the recorded telephone calls demonstrated the defendant's knowledge that his co-defendants were not going to testify against him and that he believed it would be a good time for him to go to trial. Considering these facts and circumstances, it was reasonable for the trial court to hold that it was "certainly more likely than not" that the defendant caused or acquiesced in the unavailability of the three co-defendants at trial. Accordingly, it was well within the trial court's discretion to allow the videotaped statements of the three co-defendants and there was no violation of the defendant's rights under the confrontation clause.

¶ 75    Finally, the defendant argues that the trial court erred when it denied his motion for a new trial and did not find him unfit to stand trial. He claims that the record shows that he was confused during the trial and that he displayed symptoms consistent with discontinuing psychotropic medicine. He points out that Dr. Nadkarni could not complete the evaluation interview and was therefore unable to render an opinion as to the defendant's fitness. The defendant accordingly

claims that he was unfit to stand trial and asks us to remand his case for a new trial, or at the very least, for a new retroactive fitness evaluation to determine if he was fit to stand trial.

¶ 76    A trial court's ruling on a motion for new trial will not be reversed on appeal absent an abuse of discretion. *People v. Willmer*, 396 Ill. App. 3d 175, 181 (2009). Our review under this standard involves consideration of whether the trial's outcome was "supported by the evidence and whether the losing party was denied a fair trial." (Internal citations omitted.) *People v. Abdullah*, 336 Ill. App. 3d 940, 949–50 (2002) (quoting *People v. Dixon*, 256 Ill. App. 3d 771, 778 (1993)).

¶ 77    The defendant argues that the trial court abused its discretion in denying his motion for a new trial on the basis that he was unfit to stand trial. A defendant is presumed fit to stand trial and is entitled to a fitness hearing only when a *bona fide* doubt of his fitness is raised. *People v. Stephens*, 2012 IL App (1st) 110296, ¶ 90. A defendant is unfit if, because of his mental or physical condition, he is unable to understand the nature and purpose of the proceedings against him or to assist in his defense." 725 ILCS 5/104-10 (2018). A defendant bears the burden of proving there is a *bona fide* doubt of fitness. *People v. Hanson*, 212 Ill. 2d 212, 222 (2004). In determining whether a *bona fide* doubt exists, the trial court may consider irrational behavior, demeanor in court, and any relevant medical opinions. *People v. Easley*, 192 Ill. 2d 307, 319 (2000).

¶ 78    In this case, even though the trial court did not have a *bona fide* doubt of the defendant's fitness, it nonetheless granted the defendant's request and ordered a retroactive fitness evaluation in "an abundance of caution." Following the evaluation by Dr. Nadkarni, the trial court determined that no *bona fide* doubt existed as to the defendant's fitness. The record on appeal supports that determination. Nothing in the record indicates that, during the trial, the defendant felt confused or

disorientated. Dr. Howard testified that the defendant's mood disorder would not render him unfit to stand trial. Two other doctors found that the defendant never suffered from bipolar or any psychotic disorder.

¶ 79    The defendant stresses that his psychotropic medication, Depakote, was discontinued on the first day of trial. But Dr. Howard testified that the defendant *refused consent* for Depakote and instead requested Gabapentin, which has a higher concern for abuse. During his trial, the defendant was prescribed Venlafaxine on and off for a temporary basis, but Dr. Howard explained that withdrawal symptoms from the discontinuation of Venlafaxine may include headaches, sweating, sleep disturbances, mild tremors, tingling in the neck, and increased anxiety; not confusion or disorientation.

¶ 80    Curiously, the defendant asks for relief in the form of a retroactive fitness evaluation, but he *already* received a retroactive fitness evaluation. And the trial court used that evaluation to determine that there was no *bona fide* doubt as to the defendant's fitness. As discussed, there is nothing in the record which would support finding that the trial court made an improper determination. In turn, the trial court did not abuse its discretion in denying the defendant's motion for a new trial on the basis that he was unfit to stand trial.

¶ 81                                     CONCLUSION

¶ 82    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 83    Affirmed.