NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (4th) 230146-U

NO. 4-23-0146

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 17, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Peoria County |
| CARLOS D. JONES, | ) | No. 22CF76 |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | Honorable |
| | ) | James A. Mack, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Justices Steigmann and Doherty concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The appellate court affirmed, finding (1) the State's closing argument did not deny defendant a fair trial, (2) the trial court did not commit plain error in admitting the Shot Spotter map into evidence, (3) the court properly admitted the bullet into evidence, (4) no error occurred when the court denied defendant's motion to suppress, and (5) the court made an ultimate decision regarding whether the State committed purposeful discrimination, which rendered the first *Batson* step moot (see *Batson v. Kentucky*, 476 U.S. 79 (1986)).

¶ 2    The State charged defendant, Carlos D. Jones, with two counts of aggravated discharge of a firearm after an incident during which defendant allegedly fired gunshots at Peoria Police Department officers Emaline Waid and Kody Grinslade while running away from them. After a jury trial, defendant was found guilty and sentenced to 22 years and 6 months' imprisonment on each count, to run concurrently.

¶ 3        Defendant appeals, arguing (1) the State's comments during its closing argument denied him a fair trial, (2) the trial court erred in admitting the Shot Spotter map as an exhibit for the State but preventing him from cross-examining the exhibit's limitations, (3) the court erred in admitting one of the projectiles found at the scene into evidence, (4) the court erred in denying defendant's motion to suppress the authorized overhears, and (5) the court improperly collapsed the three-step *Batson* inquiry (see *Batson v. Kentucky*, 476 U.S. 79 (1986)) and failed to determine whether defendant presented a *prima facie* discrimination case and whether he ultimately demonstrated purposeful discrimination. We affirm.

¶ 4                              I. BACKGROUND

¶ 5        On February 15, 2022, a grand jury indicted defendant on two counts of aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(3) (West 2022)). The indictment alleged defendant knowingly and intentionally discharged a firearm in the direction of officers Waid and Grinslade, and defendant knew they were peace officers engaged in the execution of their official duties. Defendant waived his right to counsel and proceeded *pro se*.

¶ 6                        A. Pretrial Motion and *Voir Dire*

¶ 7        Prior to trial, defendant filed a handwritten petition seeking to ensure African American individuals would be included in the venire. During the hearing on the motion, the trial court stated, "[B]lacks will not be excluded from the jury, but there will be no extra provision to have any particular group represented more so than what the jury pool that is sent to us by the jury commission provides."

¶ 8        During *voir dire*, the State sought to use a peremptory challenge to remove venireperson J.W. Defendant objected, arguing, "If I filed a motion asking for blacks to be included, and it's only 2 in a panel of 30, and she gets excluded, that leaves me with one black.

So, that's a bias to me." The State immediately responded to the objection, asserting, "Your Honor, for purpose of the record, she's the one that said her cousin was convicted of murder. The other juror we excused for cause when she said her relative was convicted of murder and was pending sentencing. That's the reason the State moved to remove [J.W.]." After defendant responded to the State's explanation, the trial court denied defendant's objection and allowed the State to exercise its peremptory challenge, saying, "I'm going to find the State's statement of race-neutral reason for the exclusion."

¶ 9                                    B. Trial Testimony

¶ 10         At trial, Waid testified she was an officer for the Peoria Police Department. During the events in question, she wore a full police uniform and drove a squad vehicle with the words "Peoria Police" on its side. On January 31, 2022, shortly before midnight, Waid was dispatched to a gas station. She was looking for a "[s]uspicious male wearing all black" who allegedly threw a gun under a car. When she arrived, she observed defendant standing at the corner holding a tire iron. Waid and Grinslade approached defendant. When Waid informed defendant she was going to pat him down for weapons, defendant fled down an alley. Both officers began to chase after defendant, but Waid slipped and fell on some ice. Waid heard gunshots fired at her from the alley, and when she reviewed her body camera video, she observed muzzle flashes. Waid did not fire any shots during the incident.

¶ 11         Grinslade testified he responded to the same dispatch call Waid received. He drove a marked Peoria police squad car and wore a full police uniform. When Grinslade arrived, he observed a vehicle parked near the gas station. One man stood next to the vehicle's driver's side door, wearing a mask and a hood. Defendant stood on the corner of the sidewalk and the gas station parking lot. Defendant wore a black "trench coat style jacket," a hat, a hood, and a mask

"slightly pulled down over his face," and he was holding a four-way tire iron. Grinslade initially approached defendant, gun drawn, and ordered him to show his waistband. Defendant did not comply. The man standing next to the vehicle approached Grinslade, so Grinslade turned and moved to him. Grinslade then heard footsteps, and Waid called out that defendant was running. Grinslade pursued defendant, who headed down the alley. Grinslade saw "a muzzle flash" and heard the sound of gunfire coming from the alley. At the same time, Waid screamed and fell. Grinslade returned fire, thinking Waid had been shot. During the incident, Grinslade saw a total of two or three muzzle flashes coming from the alley. As Grinslade returned fire, he slipped on the ice, and defendant escaped.

¶ 12    During cross-examination, defendant emphasized Grinslade's firearm was drawn when he approached, and defendant suggested, "[I]s it possible that you caught me off guard and startled me?" Defendant attempted to use a report created by the Shot Spotter system to establish at least 11 shots were fired during the incident and the officers were located at the alley's entrance. When defendant asked Grinslade to testify regarding the report's contents, the State objected on foundation grounds. Grinslade confirmed he was familiar with the Shot Spotter system and used it "quite often." Grinslade testified, "The number of rounds may be accurate, but I can tell you from my experience and my training that where those dots are on that map are not where we always find those casings or those shots fired." Grinslade said officers rely on the map included in a Shot Spotter report to provide "a general area" for where gunshots were fired. When defendant attempted to enter the Shot Spotter report into evidence, the State objected, arguing Grinslade lacked the requisite knowledge and familiarity with sections of the report to vouch for its authenticity. Ultimately, the trial court permitted defendant to enter a chart created by the Shot Spotter system, which listed the number of gunshots detected and the amount of time

that elapsed between each shot. The court did not permit defendant to enter other portions of the Shot Spotter report into evidence because Grinslade was unfamiliar with those aspects of the Shot Spotter system. Grinslade testified he "use[d] a different side of the program," where he "basically ha[d] a map and a screen. It gives [officers] a dot and a circle around it of where those shots may have come from."

¶ 13　　　　Jacob Moushon, the chief crime analyst for the Peoria Police Department, testified he was familiar with the Shot Spotter system and how it worked. He described the system and its notification process thusly:

> "Shot Spotter is an [*sic*] software system that uses microphones that are set up throughout the city. In order for a gunshot detection to be used by Shot Spotter, it has to triangulate off of three microphones throughout the city. So, when the system hears a shot, it triangulates off a minimum of three different microphones.
>
> That shot then goes to the Shot Spotter review team that's in California. At that time a certified Shot Spotter analyst reviews the audio and either determines that that audio was in fact a gunshot or it was something else.
>
> If that review does determine that it is a gunshot, that alert then goes to us through multiple different systems; mainly it's through our squad cars and a couple other different things. So, it is a web-based portal called Shot Spotter Alert, and we get those alerts through our phones, and dispatch also gets that alert as well."

The alerts provide officers with a map identifying approximately where the shots were fired. The map is "accurate within 25 meters." According to Moushon, "the initial review happens within under a minute," and the detailed forensic report takes approximately a day to prepare.

¶ 14        The State moved to admit the map created by the Shot Spotter system into evidence. Defendant objected, claiming, "It's the same thing that I tried to show yesterday, your Honor, same thing, and you granted [the State's] objection." The trial court overruled defendant's objection. When the State moved to publish the map, defendant replied, "Go ahead."

¶ 15        Robert Telford, a crime scene investigator with the Illinois State Police, ensured Waid's and Grinslade's respective firearms were secured and collected. Nine 9-millimeter cartridge cases and three projectiles were discovered at the scene. Telford described one of the projectiles as "an old bullet" that "appeared a little bit corroded."

¶ 16        Patrick Murphy, a special agent with the Illinois State Police, testified he executed a search warrant for defendant's residence on February 1, 2022. Officers discovered a black trench coat and a 9-millimeter pistol, which was hidden in a floor vent in the upstairs hallway.

¶ 17        Murphy also interviewed Billy Woods, who resided in the same pod as defendant in the Peoria County jail. Woods offered to wear a wire and conduct an overhear of defendant. Murphy received permission to conduct the overhear on September 23, 2022, but he was unable to do so due to a lack of personnel and available equipment. The judge approved a second overhear application, which was executed on October 3, 2022. The recording was entered into evidence. In the overhear recording, Woods stated defendant used a revolver during the shooting, so there would not be any cartridge cases left at the scene. Defendant agreed. Defendant asserted Waid and Grinslade were surprised to encounter gunfire and that he saved a couple of rounds just in case. Defendant said he needed to get the officers the "f*** off of him." Regarding the State's burden to prove the charges against him, defendant said, "[K]nowing and proving is two different things."

¶ 18        Mary Meaux, a forensic scientist with the Illinois State Police who specialized in firearms, testified as an expert in firearms identification. Meaux tested the firearms, cartridge cases, and projectiles collected from the scene. According to Meaux, all nine cartridge cases and two of the three projectiles came from Grinslade's firearm. The remaining projectile came from neither Grinslade's firearm nor the pistol recovered from defendant's residence. Meaux testified that the projectile could have been fired from "a 38 revolver" or "a 38 special revolver." Meaux could not be certain because she did not receive such a firearm for testing. On cross-examination, Meaux testified the remaining projectile "was not in very good shape," and it "had kind of a greenish residue on it, sort of like oxidation possibly." The State moved to enter the cartridge cases, projectiles, and firearms into evidence, and the trial court admitted them over defendant's objection.

¶ 19        Billy Woods testified he and defendant lived in the same pod in the Peoria County jail for "a couple of months." Woods and defendant "talked frequently" and "communicated a lot" about their respective cases. Defendant told Woods he did not use the 9-millimeter pistol found in his residence during the shooting. Defendant said he used a .38-caliber revolver instead. Defendant initially went to the gas station to pick up his son, when "some guys" whose vehicle had a flat tire asked defendant if he had a tire iron. Defendant retrieved a four-way tire iron from his residence and returned to the gas station. When defendant returned, he had a .38-caliber revolver and the 9-millimeter pistol in his waistband. Officers arrived, took the tire iron from him, and told him to lift up his shirt. Defendant fled down the alley and "shot twice" with "[t]he revolver," and the officers returned fire. After evading the officers, defendant returned to his residence, wiped off both guns, hid the 9-millimeter pistol in the vent, and buried the revolver in the backyard.

¶ 20                          C. Closing Arguments

¶ 21          During closing arguments, the State suggested defendant fled from the officers because he had two guns on his person:

> "Why did he run?
>
> Because he was armed. Because he had two guns on him. That's why he ran, because he knew when the officer asked him to lift his shirt, which they merely did for just officer safety, just because they didn't know what was going on at the scene, they asked him to put the tire iron down and lift his shirt.
>
> If he was as innocent as he's going to want to tell you he is, he would have lifted his shirt. Because there was nothing threatening happening there. The threat was him, because he was armed. The officers had no idea that when they were trying to disarm this man that he really was armed. It wasn't just a tire iron, and that's why he ran."

¶ 22          The State highlighted Woods's testimony, the overhear recording, and the Shot Spotter map as evidence of defendant's guilt. The State specifically noted, "[I]n the eavesdrop *** [defendant] told [Woods] 'I shot to get them the f*** off me,' and that makes sense. They were chasing him, and he was trying to get away." The State relied on the Shot Spotter map to place defendant further down the alley than the officers when he allegedly shot at the officers. Regarding Woods's testimony, the State offered the following:

> "Woods told you that the defendant admitted that when he first fired, he shot behind him just to try to [the officers] off of him. And *** Woods told you that the defendant was obsessed with the evidence; what [the State] didn't have. Did

*** Woods ever tell you the defendant denied being involved and denied shooting?

Nope. Because he didn't. He didn't. He just was having a whole lot of fun attacking the evidence and just like [Woods] talked about that they do in the jail cell. They all talk about their cases. So, when you look at all the evidence, and you compare that to *** Woods's testimony, you'll see a lot of corroboration to other physical evidence from the scene."

¶ 23    The State also recapped the forensic evidence and Meaux's testimony: "[Meaux] testified that she collected the shell casings that all matched *** Grinslade's gun. She was able to positively eliminate from the very beginning *** Waid's gun from having fired at all, but we know there were more shots.

We have nine shots from *** Grinslade's gun. We know there were more shots because Shot Spotter alone picked up at least 11, and remember, we had some fired projectiles recovered. There was one unknown projectile recovered from down near where the defendant was said to have been standing in that general area partway down the alley which was a 38 caliber, and the expert said it could be fired in a revolver.

She didn't have a gun to compare it to, so she can't say for sure, but it certainly did not match either of the officers' guns or the semi-automatic found in the defendant's home. So, there's a lot of forensic evidence. There's a lot of video to corroborate the testimony of the officers, but frankly, to corroborate the testimony of Billy Woods."

¶ 24       In his closing argument, defendant told the jury, "[F]or the last two days, you got a chance to hear what I've been up against with the prosecutor, judges, public defenders, law enforcement, and fellow inmates." Defendant called the prosecutor "a master at editing things the way she want [*sic*] them to look." Defendant tried to testify about his motivation to run, and the State objected. After the trial court sustained the objection, defendant reiterated to the jury, "Like I first stated, you all got the chance to witness what I've been up against. As she said, People of Illinois, this is what I'm up against." Defendant again tried to testify regarding why he ran, saying, "[A]ll of a sudden, out of nowhere, I'm blind sided by an officer that has his gun out, and we have had several officer[-]involved shootings where certain people didn't make it." The State renewed its objection. The court sustained the objection and told defendant he needed to avoid testifying during his closing argument. However, defendant continued to speak to his state of mind during the shooting, arguing, "It's possible that I was startled and in fear for my life."

¶ 25       Defendant also sought to explain his statements during the overhear recording:

"So, the difference from the county jail versus real life is this. In the county jail, when people see your cases, that's how they view you. So whatever you you're [*sic*] accused of, because there's a TV in there that we heard testimony of, and everyone in there loves to watch the news. So, according to your cases is how each and every individual view you in jail.

So, they already knew that I was being accused of shooting at officers. So, how did that help me? Well, they figured if he did this to officers, we better think twice before trying him. So, I used that to my advantage, because at the end of the day, it's not what's said that convicts you."

¶ 26       In rebuttal, the State responded to defendant's accusations:

"Well, evidently I've been editing all the videos. The defendant has everything. He can show you. He has the ability to call any witness he wants and present any evidence in this case he wants, but he wants you to feel sorry for him because he doesn't know how to do it.

Let's remember, he chose to represent himself. So, his solution is to accuse me of editing videos improperly or whatever it is. It's just ridiculous. It's grasping at straws."

The State argued Woods was a credible witness, saying:

"Ladies and gentlemen, if *** Woods was making everything up about [defendant], everything he told the police in that August 31st interview was all made up, he'd have been caught red-handed when the wire was playing because the defendant would say, 'I don't know what you're talking about. I didn't do this. I don't know what you're talking about. I didn't do anything. Who are you? What's your problem?' "

The State further argued, "[I]f you listen to the testimony, or if you listen to the overhear *** what you don't hear is the defendant ever saying, 'They've got the wrong guy,' " and, "[Defendant] is obsessively focused on what evidence we don't have against him. He's not denying the statements."

¶ 27       The State also asserted:

"[T]he defendant wants you to believe that this is some great conspiracy between the evil prosecutor and the evil court system and the evil police and everybody else. This is a great conspiracy against him because he isn't allowed to do anything.

Remember, he chose to represent himself, and the judge asked you that at the beginning. He could have had a lawyer. He chose not to."

Defendant objected. The trial court sustained the objection and instructed the State to "just say [defendant] chose to proceed to trial without an attorney." The State amended its assertion, arguing, "The defendant chose to do his trial without an attorney. That was his choice. He could have had one. He chose not to, and now he wants you to have a big pity party because we're all against him."

¶ 28 The jury found defendant guilty of the charged offenses. Defendant filed several posttrial motions, in which he argued, *inter alia*, the State "used lies to prejudice the jury" during its closing arguments, the State violated his constitutional rights by using a peremptory challenge on a black juror, and the trial court deprived defendant of a fair trial by "limit[ing] defendant's cross-examinations." Defendant asserted "most of the defendant's evidence was not admitted *** while all the State's evidence was." After a hearing, the court denied the motions.

¶ 29 The trial court sentenced defendant to concurrent terms of 22 years and 6 months' imprisonment on each count. Defendant filed a motion to reconsider his sentence, which the court denied.

¶ 30 This appeal followed.

¶ 31                                    II. ANALYSIS

¶ 32 On appeal, defendant argues (1) the State's comments during its closing argument denied him a fair trial and (2) the trial court committed reversible error by (a) admitting the Shot Spotter map as an exhibit for the State but limiting defendant's cross-examination regarding the exhibit, (b) admitting into evidence one of the bullets found at the scene, (c) denying defendant's

- 12 -

motion to suppress the authorized overhear, and (d) improperly collapsing the three-step *Batson* inquiry. We disagree.

¶ 33                    A. The State's Comments During Closing Argument

¶ 34        First, defendant argues he was denied a fair trial because the State, during its closing argument, (1) improperly "disparaged" defendant's decision to represent himself, (2) shifted the burden of proof by commenting on defendant's failure to deny his involvement in the shooting, and (3) made arguments not based on the evidence presented.

¶ 35        Defendant did not object contemporaneously to the comments in question, nor did he include them in his posttrial motions, so he failed to preserve his argument for appellate review. See *People v. Lewis*, 223 Ill. 2d 393, 400, 860 N.E.2d 299, 303 (2006); *People v. Enoch*, 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1129-30 (1988). We must conduct a plain error analysis to consider defendant's claim.

> "[T]he plain error doctrine allows a reviewing court to consider an unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565, 870 N.E.2d 403, 410-11 (2007).

In a plain error analysis, "it is the defendant who bears the burden of persuasion." *People v. Woods*, 214 Ill. 2d 455, 471, 828 N.E.2d 247, 257 (2005). "[T]he first step is to determine whether error occurred." *Piatkowski*, 225 Ill. 2d at 565.

¶ 36 "[P]rosecutors are afforded wide latitude in closing argument and improper remarks will not merit reversal unless they result in substantial prejudice to the accused." *People v. Redd*, 173 Ill. 2d 1, 30, 670 N.E.2d 583, 597 (1996). During its closing argument, the State "may comment on the evidence and any reasonable inferences that arise from it, even if those inferences reflect negatively on the defendant." *People v. Williams*, 2022 IL 126918, ¶ 44, 210 N.E.3d 1207. However, "[p]rosecutors may not argue assumptions or facts not contained in the record." *People v. Glasper*, 234 Ill. 2d 173, 204, 917 N.E.2d 401, 419-20 (2009). We consider comments made during closing argument in the context of the whole argument. *Williams*, 2022 IL 126918, ¶ 44. "Statements will not be held improper if they were provoked or invited by the defense counsel's argument." *Glasper*, 234 Ill. 2d at 204.

¶ 37 1. *Defendant's Decision to Represent Himself*

¶ 38 Defendant contends the State disparaged his constitutional rights by drawing attention to his *pro se* status and the difficulty he experienced when trying to present evidence and call witnesses. During closing argument, defendant made multiple comments to the jury about his circumstance, such as, "Now, for the last two days, you got a chance to hear what I've been up against with the prosecutor, judges, public defenders, law enforcement, and fellow inmates." After the trial court sustained the State's objection that defendant was improperly testifying, defendant continued, "Like I first stated, you all got the chance to witness what I've been up against. As she said, People of Illinois, this is what I'm up against." Later in his argument, he accused the State of editing the videos played to the jury. Defendant repeatedly mentioned the unfairness of the process and how the State had essentially fabricated evidence against him. Defendant described the prosecutor as "a master at editing things the way she want [*sic*] them to look."

¶ 39     During its closing argument, the State responded:

"Well, evidently I've been editing all the videos. The defendant has everything. He can show you. He has the ability to call any witness he wants and present any evidence in this case he wants, but he wants you to feel sorry for him because he doesn't know how to do it.

Let's remember, he chose to represent himself. So, his solution is to accuse me of editing videos improperly or whatever it is. It's just ridiculous. It's grasping at straws."

Later in the State's closing argument, it asserted:

"[T]he defendant wants you to believe that this is some great conspiracy between the evil prosecutor and the evil court system and the evil police and everybody else. This is a great conspiracy against him because he isn't allowed to do anything.

Remember, he chose to represent himself, and the judge asked you that at the beginning. He could have had a lawyer. He chose not to."

After defendant objected, the State amended its comments, saying, "The defendant chose to do his trial without an attorney. That was his choice. He could have had one. He chose not to, and now he wants you to have a big pity party because we're all against him."

¶ 40     To support his contention, defendant cites as persuasive authority *State v. Salavea*, 147 Hawai'i. 564, 586-87, 465 P.3d 1011, 1033-34 (2020), in which the Supreme Court of Hawai'i found the prosecutor made several improper statements during closing argument, including the following: "Defense counsel was just *** trying to appeal to your sense of pity *** for Defendant, and that's improper." Notably, the court did not determine whether the comment

- 15 -

necessitated vacating the defendant's conviction. Instead, it found that "[b]ecause we have already determined that Salavea's conviction must be vacated [on other grounds], we need not consider whether the prosecutorial misconduct in this case would also warrant vacatur of the conviction." *Salavea*, 465 P.3d at 1034.

¶ 41　　　　First, we observe a case from the Supreme Court of Hawai'i holds no precedential value here. Second, we find the present case more analogous to *People v. Tatum*, 389 Ill. App. 3d 656, 906 N.E.2d 695 (2009). There, the State commented during its closing argument, " '[T]he defendant in this case has chosen to represent himself, and that's his right. Don't hold it against him, but for God's sakes, don't hold it against us,' " and " 'The defendant is attempting to manipulate this proceeding to his advantage. Don't you let him do it.' " *Tatum*, 389 Ill. App. 3d at 672. The reviewing court found no error, observing the defendant "continuously spoke out of turn, interrupted the proceedings[,] and was disrespectful to the court. For the State to comment that defendant was seeking some sort of advantage through his self-representation is supported by the record." *Tatum*, 389 Ill. App. 3d at 672. We reach the same conclusion here, as defendant frequently raised baseless objections, repeatedly interrupted the proceedings by speaking out of turn, and tried to testify during his closing argument. Further, defendant invited the prosecutor's comments by arguing about the inequity of his self-representation when compared to the power of the State. If defendant did not proceed *pro se*, it is reasonable to believe the trial court would not have allowed him to behave in this manner or make personal comments about opposing counsel. See *Tatum*, 389 Ill. App. 3d at 672.

¶ 42　　　　Moreover, "[s]tatements will not be held improper if they were provoked or invited by the defense counsel's argument." *Glasper*, 234 Ill. 2d at 204. In his closing argument, defendant repeatedly insisted the jury saw what he was "up against." Defendant's statements

- 16 -

demonstrated a desire to present himself as a victim, and they invited the State to comment on his purported victimhood. The State's comments during its closing argument were not improper, as they were made in response to defendant's comments in closing argument.

¶ 43                2. *Defendant's Failure to Deny His Involvement in the Shooting*

¶ 44                Defendant argues the State improperly shifted the burden of persuasion during its closing argument by arguing defendant did not deny shooting at the officers. Specifically, the State posited, "Woods told you that the defendant was obsessed with the evidence; what [the State] didn't have. Did *** Woods ever tell you the defendant denied being involved and denied shooting? Nope. Because he didn't." During its closing argument, the State endeavored to present Woods as a credible witness, saying:

> "Ladies and gentlemen, if *** Woods was making everything up about [defendant], everything he told the police in that August 31st interview was all made up, he'd have been caught red-handed when the wire was playing because the defendant would say, 'I don't know what you're talking about. I didn't do this. I don't know what you're talking about. I didn't do anything. Who are you? What's your problem?' "

The State's closing argument also included the following statements: "[I]f you listen to the testimony or if you listen to the overhear *** what you don't hear is the defendant ever saying, 'They've got the wrong guy,' " and, "[Defendant] is obsessively focused on what evidence we don't have against him. He's not denying the statements." Defendant insists the State's argument shifted the burden of proof to him. Because defendant did not make a contemporaneous objection to these statements or include them in his posttrial motion, we must review the matter for plain error. See *Lewis*, 223 Ill. 2d at 400.

¶ 45        The State may not attempt to shift the burden of proof to the defendant. *People v. Phillips*, 127 Ill. 2d 499, 527, 538 N.E.2d 500, 511 (1989). However, evidence presented by a defendant is not "beyond the reach of appropriate comment by the prosecution." *Phillips*, 127 Ill. 2d at 527. When cross-examining Woods, defendant emphasized what he did not say during the recorded conversation. Defendant initiated the discussion regarding what the recording did and did not include. The State's comments during its closing argument and rebuttal were not improper because they were made in response to witness testimony, cross-examination by defendant, and defendant's arguments, and they concerned a fair and proper inference yielded by the evidence. See *People v. Runge*, 234 Ill. 2d 68, 142, 917 N.E.2d 940, 982 (2009).

¶ 46                    3. *The State's Purported Factual Misstatements*

¶ 47        Defendant argues the State, during closing argument, misstated Meaux's testimony, misrepresented the overhear recording, and implied defendant was not allowed to possess a firearm. Again, we must review defendant's argument for plain error because he did not object to the challenged statements or include them in a posttrial motion. See *Lewis*, 223 Ill. 2d at 400. We address each statement in turn.

¶ 48                            a. Meaux's Testimony

¶ 49        During its closing argument, the State reviewed Meaux's testimony, saying, "Remember, she testified that she collected the shell casings that all matched Cody Grinslade's gun. She was able to positively eliminate from the very beginning *** Waid's gun from having fired at all, but we know there were more shots." Defendant insists this statement misrepresents the evidence because Meaux did not test Waid's firearm.

¶ 50        The record shows Meaux did not test Waid's firearm "because [Meaux] had already identified the fired evidence as having come from the other firearms." She conducted "a

full work up" of Grinslade's firearm, but not Waid's, because "[t]here was no need to analyze that one because when [Meaux] made comparisons, [Meaux] determined that all of the cartridge cases that were recovered and submitted *** came from one of the officer's firearms." Additionally, Waid testified she did not fire her weapon during the incident. Telford testified nine casings were collected at the scene, which appeared to come from Grinslade's firearm. When asked if she was "able to exclude [Waid's] gun as having fired any of the rounds at the scene," Meaux answered, "That's correct." Thus, based on Meaux's testing, she eliminated Waid's firearm as the source of the cartridge cases or projectiles found at the scene. The State's remarks were supported by the evidence and reasonable inferences therefrom. See *Williams*, 2022 IL 126918, ¶ 44.

¶ 51                                  b. The Overhear Recording

¶ 52        Defendant next argues the State misquoted him as saying, "I shot to get them the f*** off me," rather than "I got to get them the f*** off me." "Plain-error analysis applies to cases involving procedural default, not affirmative acquiescence." *People v. McGuire*, 2017 IL App (4th) 150695, ¶ 29, 92 N.E.3d 494. When a defendant affirmatively acquiesces to an action, any potential claim of error on appeal is waived. *People v. Bates*, 2018 IL App (4th) 160255, ¶ 74, 112 N.E.3d 657; *People v. Young*, 2013 IL App (4th) 120228, ¶ 25, 996 N.E.2d 671.

¶ 53        Here, rather than objecting to the State's representation of his recorded statements, defendant said the following during his closing argument:

> "So, the difference from the county jail versus real life is this. In the
> county jail, when people see your cases, that's how they view you. So whatever
> you you're [*sic*] accused of, because there's a TV in there that we heard testimony

of, and everyone in there loves to watch the news. So, according to your cases is how each and every individual view you in jail.

So, they already knew that I was being accused of shooting at officers. So, how did that help me? Well, they figured if he did this to officers, we better think twice before trying him. So, I used that to my advantage, because at the end of the day, it's not what's said that convicts you."

With these statements, it is reasonable to conclude defendant accepted the State's contention that he said, "I shot to get them the f*** off me." Even if the State misrepresented defendant's statement, both versions of the statement share a common takeaway—defendant was explaining *why* he shot at the officers, not *whether* he shot at them. Both versions suggest he did so to discourage the officers from continuing to chase him. Defendant affirmatively acquiesced to the State's representation and waived his appellate claim that the State's phrasing was incorrect. See *Bates*, 2018 IL App (4th) 160255, ¶ 74. Even if he did not, the misrepresentation was harmless error. See *People v. Fomond*, 273 Ill. App. 3d 1053, 1064, 652 N.E.2d 1322, 1330 (1995).

¶ 54                                    c. Purported Other-Crimes Inference

¶ 55            Defendant argues the State improperly implied he was either a felon or a person without proper licensing and registration when it asserted defendant was motivated to run away because he had two firearms on his person when he was asked to raise his shirt. This is a stretch. Defendant attempted to provide the jurors with an alternative explanation for why he ran during his closing argument and was stopped once, but he proceeded to do so again later. He asserted he was startled by a police officer approaching with his gun drawn and ran from a well-lit location to a darker one. He further adopted the State's assertion he was carrying two guns for purposes of argument, in order ask the jurors:

"So, ask yourself this for this insane testimony that not only did I have one gun, but I had two guns but only fired two shots. Does that make sense to you, ladies and gentlemen? That I'm being fired upon as we heard so rapidly, but all I do is fire two shots and I got two guns on me? It doesn't make sense at all."

¶ 56 "Where inferences by the prosecutor are at issue, sufficient prejudice to require reversal is present only where the prosecutor utilized improper and unsupported inferences which were substantial, repeated[,] and definitely prejudicial." *People v. Harris*, 182 Ill. App. 3d 114, 120, 537 N.E.2d 977, 980 (1989). A State's comments inferring a defendant committed other crimes do not warrant reversal if "the defendant would still not have been entitled to prevail." See *People v. Chavez*, 327 Ill. App. 3d 18, 28, 762 N.E.2d 553, 563-64 (2001). In *Chavez*, the reviewing court found no reversible error where the State erroneously asserted the defendant drove " 'an unregistered car,' " when the evidence showed merely that the vehicle was not registered to the defendant. *Chavez*, 327 Ill. App. 3d at 28. While the reviewing court acknowledged the State erred by saying the defendant violated the Illinois Vehicle Code (625 ILCS 5/3-701 (West 2000)), it found "[t]he prosecutor's error was harmless because, in its absence, the defendant would still not have been entitled to prevail." *Chavez*, 327 Ill. App. 3d at 28.

¶ 57 The same is true here. Even assuming, *arguendo*, the State erred by arguing defendant ran from the officers because he possessed firearms, defendant offered his alternative reason for fleeing when he told the jury he was "blind sided by an officer that ha[d] his gun out," and he feared for his safety. Defendant also raised this possibility during his cross-examination of Grinslade, when he suggested it was "possible *** [he] could have ran out of fear to get away from the situation." The State's comments were isolated and constituted two paragraphs of its

closing argument. See *People v. Long*, 2018 IL App (4th) 150919, ¶ 97, 115 N.E.3d 295. The trial court instructed the jury that the closing arguments were not evidence and should be disregarded if they were not based on the evidence. See *Williams*, 2022 IL 126918, ¶ 45; *People v. Harris*, 225 Ill. 2d 1, 33, 866 N.E.2d 162, 181 (2007). Even if the State's comments were improper, they do not constitute reversible error because defendant cannot show the verdict would have been different in their absence. See *Chavez*, 327 Ill. App. 3d at 28.

¶ 58                                    B. The Shot Spotter Map

¶ 59        Next, defendant argues the trial court erred by admitting the Shot Spotter map as an exhibit for the State and limiting part of defendant's cross-examination regarding the Shot Spotter system's capabilities. Defendant argues the map was inadmissible because it violated his right to confront witnesses against him, it was hearsay, and its conclusions lacked proper foundation. Defendant failed to preserve these arguments for appellate review because he did not include them in his posttrial motions. See *Lewis*, 223 Ill. 2d at 400; *Enoch*, 122 Ill. 2d at 186. However, defendant contends the map's admission constitutes first-prong plain error because the evidence was closely balanced. We disagree.

¶ 60        "In determining whether the evidence adduced at trial was close, a reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case." *People v. Sebby*, 2017 IL 119445, ¶ 53, 89 N.E.3d 675. This inquiry "involves an assessment of the evidence on the elements of the charged offense or offenses, along with any evidence regarding the witnesses' credibility." *Sebby*, 2017 IL 119445, ¶ 53. To prove defendant guilty of the charged offenses, the State needed to show defendant knowingly or intentionally discharged a firearm in the direction of a person he knew to

be a peace officer engaged in the execution of their official duties. See 720 ILCS 5/24-1.2(a)(3) (West 2022).

¶ 61    The record shows both Waid and Grinslade arrived at the scene in fully marked police uniforms and squad vehicles. Defendant fled down an alley after Grinslade approached and asked him to lift his shirt. While defendant was in the alley, Grinslade saw at least two muzzle flashes coming from defendant's direction. Meaux testified she tested nine cartridge cases and three projectiles recovered from the scene. According to Meaux, the cartridge cases and two of the projectiles came from Grinslade's firearm, while the remaining projectile came from neither Grinslade's firearm nor the pistol recovered from defendant's residence. Meaux testified the remaining projectile could have been fired from "a 38 revolver," but she could not confirm this because she did not receive such a firearm for testing. In the overhear recording, defendant agreed when Woods stated there would not be any cartridge cases left at the scene because defendant used a revolver during the shooting. Defendant told Woods he saved a couple of rounds just in case, and he needed to get the officers the "f*** off of him." Woods, who spoke with defendant frequently, testified defendant said he had a 9-millimeter pistol and a .38-caliber revolver during the incident, but he only used the revolver to shoot at the officers. Per Woods's testimony, defendant asserted he shot twice at the officers, at which point the officers returned fire. Defendant told Woods he fled to his residence, wiped off both guns, hid the 9-millimeter pistol in the vent, and buried the revolver in the backyard.

¶ 62    Accordingly, we find the trial evidence was not so closely balanced that the map's admission and the trial court's limitation of defendant's cross-examination "threatened to tip the scales of justice against the defendant." *Piatkowski*, 225 Ill. 2d at 565. The State used the map to establish the number of shots fired during the incident and place defendant further down the alley

than the officers—this evidence was already presented through witness testimony. It is reasonable to conclude defendant's cross-examination would have been duplicative of Moushon's testimony regarding the Shot Spotter system's limitations, which include the assertion the map was accurate to within 25 meters. Because the evidence was not closely balanced, reversible plain error did not occur when the court admitted the Shot Spotter map into evidence and limited defendant's cross-examination regarding the Shot Spotter system.

¶ 63                                    C. The Bullet

¶ 64          Additionally, defendant argues the trial court erred by admitting into evidence one of the bullets recovered from the scene. Defendant insists the court should have found the bullet inadmissible as irrelevant or substantially more prejudicial than probative. "[R]eviewing courts will not disturb a trial court's evidentiary ruling absent an abuse of discretion." *People v. Harvey*, 211 Ill. 2d 368, 392, 813 N.E.2d 181, 196 (2004). "An abuse of discretion occurs only where the trial court's decision is arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it." *People v. Rivera*, 2013 IL 112467, ¶ 37, 986 N.E.2d 634.

¶ 65          Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable than it would be without the evidence." *Harvey*, 211 Ill. 2d at 392; see Ill. R. Evid. 401 (eff. Jan. 1, 2011). "A trial court may reject offered evidence on the grounds of irrelevancy if it has little probative value due to its remoteness, uncertainty, or possibly unfair prejudicial nature." *Harvey*, 211 Ill. 2d at 392.

¶ 66          To support its argument defendant shot at the officers, the State introduced the bullet in question. The bullet was found in the alley where the shooting occurred. The bullet's size matched Woods's testimony regarding the type of firearm defendant used. Of the cartridge cases and projectiles recovered from the scene, all but the bullet in question came from

Grinslade's firearm. Meaux testified the bullet could have been fired from a .38-caliber revolver, and Woods testified defendant used a .38-caliber revolver during the shooting. The trial court did not abuse its discretion in admitting the bullet over defendant's relevancy objection because it tended to show defendant shot at the officers using a .38-caliber revolver. See *Harvey*, 211 Ill. 2d at 392; Ill. R. Evid. 401 (eff. Jan. 1, 2011).

¶ 67　　　　　　Similarly, the bullet was not substantially more prejudicial than probative. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice ***." Ill. R. Evid. 403 (eff. Jan. 1, 2011). For the aforementioned reasons, the bullet had significant probative value because it provided circumstantial evidence supporting the State's argument regarding the trial's ultimate issue. The trial court knew of the facts tending to limit the bullet's probative value, including its physical condition and the frequency of shootings in the area. The court considered this information and admitted the bullet into evidence over defendant's objection, and we find it did not abuse its discretion in doing so. See *Harvey*, 211 Ill. 2d at 392.

¶ 68　　　　　　　　　　　D. The Motion to Suppress

¶ 69　　　　　　Defendant further argues the trial court erred in denying his motion to suppress the overhear recording's contents. Defendant insists the State failed to show reasonable cause the proposed warrant would record any conversations about the alleged offenses during the allotted time, and "the application provided no basis to verify Woods's report of [defendant's] alleged statements."

¶ 70　　　　　　When we review a challenge to the trial court's ruling on a motion to suppress evidence, "the trial court's findings of historical fact are reviewed for clear error and may be rejected only if they are against the manifest weight of the evidence, but the trial court's ultimate

ruling as to whether suppression is warranted is reviewed *de novo*." *People v. Bass*, 2021 IL 125434, ¶ 21, 182 N.E.3d 714. We may rely on evidence introduced during the ensuing trial when reviewing a pretrial suppression ruling. *People v. Kidd*, 175 Ill. 2d 1, 25, 675 N.E.2d 910, 922 (1996).

¶ 71 "Where any one party to a conversation to occur in the future has consented to the use of an eavesdropping device to overhear or record the conversation, a judge may grant approval to an application to use an eavesdropping device ***." 725 ILCS 5/108A-3(a) (West 2022).

"The judge may authorize or approve the use of the eavesdropping device where it is found that:

(a) one party to the conversation has or will have consented to the use of the device;

(b) there is reasonable cause for believing that an individual is committing, has committed, or is about to commit a felony under Illinois law;

(c) there is reasonable cause for believing that particular conversations concerning that felony offense will be obtained through such use; and

(d) for any extension authorized, that further use of a device is warranted on similar grounds." 725 ILCS 5/108A-4 (West 2022).

¶ 72 "Reasonable cause [to issue an eavesdropping order] is present when the totality of facts and circumstances existing at the time are sufficient to warrant the belief by a man of reasonable conscience that an offense has been, is being, or will be committed." *People v. Hammer*, 128 Ill. App. 3d 735, 737, 471 N.E.2d 615, 618 (1984). "Courts have interpreted the expression 'reasonable cause' for purposes of the eavesdropping statute to be synonymous with

- 26 -

probable cause." *Hammer*, 128 Ill. App. 3d at 738. "In determining the existence of reasonable cause, unlike the situations involving search warrants, courts are not 'unduly technical.' " *Hammer*, 128 Ill. App. 3d at 737 (quoting *People v. Sylvester*, 86 Ill. App. 3d 186, 196, 407 N.E.2d 1002, 1011 (1980)). A supporting affidavit for an eavesdropping order application "need not prove beyond a reasonable doubt that a crime has been committed or even establish a *prima facie* case." *Hammer*, 128 Ill. App. 3d at 738.

¶ 73        Defendant argues the State's eavesdropping order applications were insufficient because they did not "provide a factual basis to conclude than an overhear warrant would yield any evidence of future conversations about the shooting." Defendant cites *People v. Rivas*, 302 Ill. App. 3d 421, 437-38, 707 N.E.2d 159, 172 (1998), noting reasonable cause existed there because, *inter alia*, the application asserted the defendant had "proposed another deal and promised to obtain more narcotics from [the applying officer]." While the supporting affidavit in *Rivas* mentioned the defendant's "interest in another drug sale, and his promises to obtain more cocaine," the reviewing court relied on "the totality of the circumstances" to find reasonable cause. *Rivas*, 302 Ill. App. 3d at 438.

¶ 74        As in *Rivas*, we find the State's applications contained sufficient information to support the trial court's reasonable cause findings. According to the applications, Woods resided in the same pod of the Peoria County jail as defendant, and defendant previously discussed the shooting's details with Woods, including the type of firearm defendant used. Specifically, defendant told Woods he was armed with a semiautomatic pistol and a revolver during the incident. Defendant also described the incident to Woods, including how and where he hid the revolver. Defendant "disclosed information to Woods on numerous occasions and on a regular basis" during the eight months preceding the applications. An eavesdropping order application

"should be viewed in a commonsense manner." *Rivas*, 302 Ill. App. 3d at 437. The court did not err in granting the State's eavesdropping order applications, as the totality of the circumstances provided reasonable cause to conclude further conversations between defendant and Woods would include information about the shooting.

¶ 75                                   E. The *Batson* Inquiry

¶ 76        Finally, defendant argues the trial court improperly collapsed the three-step *Batson* inquiry and failed to determine whether defendant presented a *prima facie* case of discrimination and whether defendant ultimately showed purposeful discrimination by the State.

¶ 77        During *voir dire*, prosecutors may not remove potential jurors based on race. *Batson*, 476 U.S. at 89. Under *Batson*, courts must follow a three-step process to determine whether the State's peremptory challenge removed a venireperson based on race: (1) the defendant must make a *prima facie* showing the State's challenge was racially based, (2) the State may offer a race-neutral reason for the challenge, and (3) the defendant may rebut the offered race-neutral reason as pretextual. *People v. Davis*, 231 Ill. 2d 349, 360-63, 899 N.E.2d 238, 245-47 (2008). Generally, a trial court's ruling on a *Batson* claim is entitled to great deference and will not be reversed unless it is clearly erroneous. *Davis*, 231 Ill. 2d at 364. "A determination is clearly erroneous only when a review of the entire record leaves the reviewing court with the definite and firm conviction that a mistake has been made." *People v. Payne*, 2015 IL App (2d) 120856, ¶ 43, 40 N.E.3d 43. Recently, in *People v. Talley*, 2023 IL App (4th) 221013, ¶¶ 20-24, we applied the *de novo* standard of review when considering a challenge to the adequacy of a trial court's procedure addressing a *Batson* challenge.

¶ 78        A trial court "can commit error when it is unclear whether the trial court found defendant established a *prima facie* case and it appears the proceedings drifted into the second

- 28 -

stage of the *Batson* analysis." (Internal quotation marks omitted.) *People v. Jones*, 2021 IL App (1st) 181266, ¶ 29, 196 N.E.3d 1050. However, when the court "does not determine whether the defendant made a *prima facie* showing, the State offers an explanation for the peremptory challenge, and the court rules on the ultimate question of intentional discrimination, then the issue of whether the defendant made a *prima facie* showing becomes moot." *People v. Gonzalez*, 2019 IL App (1st) 152760, ¶ 67, 142 N.E.3d 253; see *People v. Rivera*, 221 Ill. 2d 481, 506, 852 N.E.2d 771, 786 (2006); *People v. Austin*, 2017 IL App (1st) 142737, ¶ 41, 79 N.E.3d 312.

¶ 79          In *Gonzalez*, after the defendant made a gender-based *Batson* objection, the State presented its explanation for striking the potential jurors before the trial court decided whether defendant made a first-step *prima facie* showing of discrimination. *Gonzalez*, 2019 IL App (1st) 152760, ¶ 69. Once the State finished its explanation, the court found the State provided adequate gender-neutral reasons for the peremptory challenge. *Gonzalez*, 2019 IL App (1st) 152760, ¶ 69. On appeal, the reviewing court found the issue of whether the defendant made a *prima facie* showing under *Batson* was moot. *Gonzalez*, 2019 IL App (1st) 152760, ¶ 69. So too here. After the defendant raised his race-based *Batson* objection, the State offered a race-neutral explanation for its peremptory challenge. After hearing defendant's rebuttal, the trial court accepted the State's explanation. Because the court found the peremptory challenge did not violate *Batson*, its lack of a decision regarding the *prima facie* showing became moot. See *Gonzalez*, 2019 IL App (1st) 152760, ¶ 69; *Rivera*, 221 Ill. 2d at 506. Therefore, remand is not warranted based on defendant's improper collapsing claim or his argument the court failed to determine whether defendant made a *prima facie* showing of discrimination.

¶ 80          Defendant also contends the trial court failed to determine whether he ultimately demonstrated purposeful discrimination by the prosecution. The record refutes this assertion.

After defendant objected to the State's peremptory strike, the State explained the potential juror in question "said her cousin was convicted of murder. *** That's the reason the State moved to remove [her]." Defendant presented a rebuttal argument, asserting, "Several people stated some type of conviction for murder. Several people stated other convictions that she kept, so I don't see what the bias is to even have her excluded. That's not a valid reason, because we had about four other people speak on murder convictions." The court disagreed and found the peremptory challenge did not violate *Batson*, saying, "I'm going to find the State's statement of race-neutral reason for the exclusion." In doing so, it made an ultimate determination that no intentional discrimination occurred. "[W]e are unable to conclude that the court's finding is clearly erroneous." *Payne*, 2015 IL App (2d) 120856, ¶ 50. Because " '[t]he *** court is presumed to know the law and apply it properly, absent an affirmative showing to the contrary in the record,' " we find the court proceeded properly under *Batson*. See *Vance v. Joyner*, 2019 IL App (4th) 190136, ¶ 91, 146 N.E.3d 285 (quoting *Cavitt v. Repel*, 2015 IL App (1st) 133382, ¶ 64, 32 N.E.3d 712).

¶ 81                                    III. CONCLUSION

¶ 82            For the foregoing reasons, we affirm the trial court's judgment.

¶ 83            Affirmed.